UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ISIAH WILLIAMS,

        Petitioner,

        v.                                                          20-CV-688 (JLS)

RAYMOND SHANLEY,

        Respondent.

## DECISION AND ORDER

*Pro se* petitioner Isiah Williams, a prisoner in Respondent's custody, has filed

an amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. Dkt. 39.

Williams challenges the constitutionality of the December 4, 2015 judgment entered

against him in New York State Supreme Court, Monroe County (Reed, A.J.),

following a jury verdict convicting him of two counts of second-degree criminal

possession of a forged instrument (New York Penal Law ("PL") § 170.25) and one

count of second-degree scheme to defraud (PL § 190.60). Williams also has filed

motions seeking an evidentiary hearing, Dkt. 45, appointment of counsel, Dkt. 47,

leave to file excess pages, Dkt. 54, striking of Respondent's memorandum of law in

opposition to the amended petition, Dkt. 61, and the removal of the New York

Attorney General's Office as counsel for Respondent, Dkt. 64. For the reasons

below, the Court grants Williams's motion for leave to file excess pages (Dkt. 54),

denies the remaining motions for miscellaneous relief (Dkt. 45, 47, 61, 64), and

dismisses the amended petition (Dkt. 39).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   STATE COURT PROCEEDINGS

#### A.   The Indictment

The challenged conviction arises from Williams's 2015 retrial on Monroe County Indictment 2008-0446 ("Indictment 446"). Dkt. 20-7, at 96–116. Indictment 446 charged Williams with fifteen offenses stemming from his alleged involvement as the leader of a counterfeit check-cashing ring operating in Monroe County, New York, from August to December 2007.

#### B.   The First Trial

Williams's first trial on Indictment 446 was conducted in November 2009, in New York State, Monroe County Court (Connell, J.). Dkt. 20-7, at 131. Williams represented himself without standby counsel. *Id.*, at 149–50, 158, 160–62. Prior to jury deliberations, Count 7, which charged fourth-degree grand larceny (PL § 155.30), was reduced to petit larceny (PL § 155.25).[1] The jury returned a verdict convicting Williams of Counts 3 through 15. *Id.*, at 131, 284–85.

The jury acquitted Williams of Counts 1 and 2, which involved the passing of a counterfeit check at Five Star Bank on November 23, 2007, by Shameka Canady. *Id.*, at 96–97, 103, 284–85. On January 21, 2010, Williams was sentenced as a persistent felony offender, *see* PL § 70.10(1), to an aggregate term of twenty years to life in prison. *Id.*, at 131.

---

[1] Count 7 was reduced to petit larceny because the counterfeit check supporting this charge was for less than $1,000. It therefore did not meet fourth-degree grand larceny's stolen-value element.

C.     The Motion to Vacate the 2009 Conviction

On June 27, 2011, while his direct appeal of the 2009 conviction was pending,

Williams filed a *pro se* motion to vacate the judgment pursuant to New York

Criminal Procedure Law ("CPL") § 440.10.  A copy of this CPL § 440.10 motion and

the order disposing of it are not in the state court records.  However, the state court

records contain a copy of the prosecutor's letter to Monroe County Court Judge

Vincent M. Dinolfo dated August 1, 2011, which was written in response to the

motion.  Dkt. 20-3, at 643–45; Dkt. 20-4, at 1–6.  In this letter, the prosecutor noted

that she apparently had not disclosed an investigative report to Williams prior to

the 2009 trial.  Dkt. 20-3, at 643.  Accordingly, the prosecutor provided a copy of the

report to Williams and his appellate counsel.  *Id.*

The prosecutor also indicated that, based on that report, Dkt. 20-4, at 6, and

further discussions with Key Bank, it appeared that Tameka Jones ("Jones") had

provided factually incorrect testimony before the grand jury regarding Count 4 of

Indictment 446 charging petit larceny.  Dkt. 20-3, at 643.  The prosecutor explained

that, contrary to Jones's testimony, Key Bank did not distribute any money to Jones

when she passed check number 407759 for $961.11 on November 29, 2007.[2]  *Id.*;

---

[2] On direct appeal, Williams challenged his conviction on Count 4 as against the
weight of the evidence, and the Appellate Division, Fourth Department ("Fourth
Department"), of New York State Supreme Court rejected the claim as "academic."
The Fourth Department noted that the parties did not dispute that Count 4 "was
later dismissed on the People's consent by an order of County Court (Vincent
Dinolfo, J.) determining defendant's motion pursuant to CPL article 440." *People v.
Williams*, 101 A.D.3d 1730, 1731-32, 957 N.Y.S.2d 548, 551 (4th Dep't 2012)
("*Williams I*").

Dkt. 20-4, at 6.  The prosecutor indicated that she was reviewing all crime report numbers associated with Williams to determine if any other items had not been disclosed to him.  Dkt. 20-3, at 644.

On September 30, 2011, the prosecutor filed an answering affirmation, Dkt. 20-4, at 7– 10, with exhibits, *Id.*, at 11–13, in opposition to the CPL § 440.10 motion. The prosecutor noted that it was unclear whether she had provided Williams with "approximately twenty-five additional documents." *Id.*, at 8.  Although the prosecutor believed that the information in the documents was cumulative to information in other documents she previously had disclosed, she forwarded the "approximately twenty-five documents" to Williams as exhibits to her answering affirmation. *Id.*

The "approximately twenty-five documents" themselves are not in the state court records, but there is a copy of the table describing each of the documents that the prosecutor attached to her affirmation. *Id.*, at 11–13.  According to this table, the twenty-five documents consisted of various reports, notes, and witness depositions generated by the Monroe County Sheriff's Office during their investigation into Williams's check-cashing activities. *Id.*

D.    **Reversal of the 2009 Conviction**

On direct appeal, Williams was represented by assigned appellate counsel who asserted numerous grounds for reversal.  Dkt. 20-7, at 117–206.  The Fourth Department unanimously reversed the conviction on December 28, 2012.  *See*

*Williams I*, 101 A.D.3d 1730, 957 N.Y.S.2d 548.[3]  The Fourth Department concluded that the County Court did not "undertake a searching inquiry" to ensure that Williams was "aware of the dangers and disadvantages of proceeding without counsel" and, therefore, it erred in granting Williams's request to proceed *pro se*. *Id.*, 101 A.D.3d at 1733, 857 N.Y.S.2d at 552.  Additionally, the County Court erroneously determined that Williams had forfeited his right to counsel because, in the Fourth Department's view, Williams's conduct was not sufficiently egregious to warrant such a harsh sanction.  *Id.*, 101 A.D.3d at 1733, 857 N.Y.S.2d at 552. Because the "tainted proceedings adversely impacted" Williams, the Fourth Department reversed the conviction.  *Id.*, 101 A.D.3d at 1733, 857 N.Y.S.2d at 552.

---

[3] This memorandum decision disposed of two appeals, denominated by the Fourth Department as "appeal no. 2" and "appeal no. 3."  *Williams I*, 101 A.D.3d at 1730, 957 N.Y.S.2d at 549.  "Appeal no. 3" was the challenge to the 2009 conviction on the charges in Indictment 0446.  "Appeal no. 2" involved Monroe County Indictment 2008-0495 ("Indictment 495"), which charged Williams with various offenses based on his possession of stolen checks when he was arrested on December 24, 2007. *Williams I*, 101 A.D.3d at 1730, 957 N.Y.S.2d at 549.  After a jury trial on Indictment 495, Williams was convicted of four counts of second-degree criminal possession of a forged instrument and one count of fifth-degree criminal possession of stolen property.  *Id.*  The Fourth Department vacated the sentence (but not the convictions) in appeal no. 2 and remitted for resentencing because the County Court did not make a "searching inquiry" into whether Williams understood the hazards of representing himself at the sentencing hearing.  *Id.*, 101 A.D.3d at 1733, 957 N.Y.S.2d at 552.  This habeas proceeding does not concern the convictions obtained, or the sentences imposed, under Indictment 495.

E.    The Motion for Substitution of Counsel

The retrial was conducted in Monroe County Court in June 2015.[4]  Shortly

before jury selection began, Williams made a *pro se* request for substitution of his

most recently assigned counsel, Matthew Mix, Esq. ("Attorney Mix" or "trial

counsel").  Dkt. 20-9, at 22–34.  The gist of Williams's dissatisfaction with Attorney

Mix was that he did not communicate sufficiently with Williams in preparation for

trial, did not conduct a full investigation, and did not adopt Williams's *pro se*

motions.  *Id.*, at 31–34.  The prosecutor responded that Williams had a "history . . .

of trying to remove attorneys on the eve of trial" and characterized the current

substitution motion as "just as baseless as what happened before." *Id.*, at 33.  In

addition to his request for new counsel, Williams raised numerous complaints about

the prosecutor's office and the trial court.

The trial court denied Williams's "*pro se* motions in all aspects," observing

that "Mr. Mix may be like the twelfth attorney involved in [Williams]'s case." *Id.*, at

34, 51, 54–55.  The trial court denied the substitution motion from the bench:

_____

[4] Justice Frederick G. Reed ("Justice Reed" or "the trial court") of the New York
State Supreme Court, Ontario County presided over the retrial in Monroe County
Court.  Justice Reed previously had presided over Williams's 2009 criminal trial in
Ontario County Court.  *People v. Williams*, 101 A.D.3d 1728, 957 N.Y.S.2d 783 (4th
Dep't 2012) (vacating May 1, 2009 conviction in Ontario County Court of second-
degree criminal possession of a forged instrument and dismissing conviction of
fourth-degree grand larceny without prejudice to re-represent to another grand
jury).  Justice Reed presided over the 2015 retrial on the Ontario County charges,
which later was reversed.  *People v. Williams*, 163 A.D.3d 1418, 80 N.Y.S.2d 608
(4th Dep't 2018) (vacating August 5, 2015 conviction following retrial in Ontario
County Court on charge of second-degree criminal possession of a forged
instrument).

And I do not find any basis in [Williams]'s motions to have Matt Mix
removed.

If I granted that, there is absolutely no one else that could represent
[Williams] because he's exhausted all of the assigned counsel in
Ontario County and all of the assigned counsel in Monroe County. And
frankly, even the Court system is unable to appoint any other
attorneys. So he is denied in all aspects of this motion.

*Id.*, at 37–38.

## F.    The 2015 Retrial

At the retrial on Indictment 446, the prosecution presented evidence

regarding Counts 3, 5, 6, 8, 9, 10, 11, 12, 13, 14, and 15. As noted above, at the 2009

trial, Williams was acquitted of Counts 1 and 2, and Count 7 was reduced from

fourth-degree grand larceny to petit larceny. In addition, Count 4 was dismissed

with the prosecution's consent in connection with the C.P.L. § 440.10 motion

challenging the 2009 judgment.

Prior to jury deliberations, the trial court dismissed Counts 6, 8, 9, 10, 11, 12,

13, and 14 with prejudice due to various deficiencies in the proof presented. Dkt.

20-9, at 1118–19. Counts 3, 5, and 15 were submitted to the jury. Count 3 charged

Williams with second-degree criminal possession of a forged instrument (PL §

170.25) based on the passing of a check in the amount of $961.11 payable to Jones

on November 29, 2007. Count 5 also charged second-degree criminal possession of a

forged instrument (PL § 170.25) and involved the passing of a check in the amount

of $931.16 payable to Veronica Hay-Boler ("Hay-Boler") on December 13, 2007.

Count 15 charged Williams with first-degree scheme to defraud (PL § 190.65(1)(b))

based on his involvement in multiple counterfeit check transactions that occurred between August 30, 2007, and December 20, 2007.

The following summary of the prosecution's proof does not include the testimony of the witnesses who testified relative to the dismissed counts.

### 1.   The Prosecution's Case

Danielle Ruise ("Ruise") testified that, in 2007, she lived next-door to Williams, who resided at 12 Arnett Boulevard.  Dkt. 20-9, at 574–75.  Williams asked Ruise if she "wanted to make some money" and explained the check-cashing scheme to her.  *Id.*, at 575–76.  He said he would give Ruise a check payable to her, and she would cash the check at a bank.  *Id.*, at 576.  Williams promised to pay Ruise for cashing checks and assured her she would not "get in trouble" so long as the check was for less than $5,000.  *Id.*  Williams instructed Ruise that after she cashed the check, she should report to the police that someone had stolen her identity and then "throw [her] stuff away."  *Id.*

On August 30, 2007, Williams drove Ruise in a silver SUV to the Penfield branch of Canandaigua National Bank ("CNB").  *Id.*, at 576–77.  He gave her a check in the amount of $963.21 from the University of Rochester payable to her.  *Id.*, at 577–78, 582–83.  Williams told Ruise to pretend the check was for a "school loan."  *Id.*, at 577.  Ruise knew it was a "fake check" because Williams had made it on the computer, and she had never gone to the University of Rochester.  *Id.*, at

581.[5]  Williams instructed Ruise to enter the bank and try to cash the check, but if the teller went to the back of the bank at any point during the transaction, she should leave the bank. *Id.*, at 577.  Williams explained that such behavior by a bank teller meant that the teller knew the check was "not real." *Id.*

Ruise successfully cashed the check and returned to Williams's car with the proceeds. *Id.*, at 583.  At first, he gave her just "a little bit" of the proceeds, but when Ruise insisted he pay her more, Williams gave her $400. *Id.*

Jones testified that during 2007, she "cashed checks" with Williams. *Id.*, at 779–80.  On November 29, 2007, Williams drove Jones in a silver SUV to the Perinton, New York branch of Key Bank. *Id.*, at 580.  Williams gave Jones a check for $961.11 from the Arc of Monroe County payable to her. *Id.*, at 781–82.  Jones knew it was not a valid check because she had never worked at the Arc of Monroe County. *Id.*, at 785.

While Jones was inside the bank attempting to cash the check, Williams called her on her cell phone to make sure that "everything was running smoothly." *Id.*, at 785–90.[6]

---

[5] A University of Rochester representative testified that the school had not issued the check Ruise cashed on August 30, 2007, at CNB. *Id.*, at 602, 604–06.

[6] Jones testified that her cell phone number was 585-643-8516. *Id.*, 789–90. Records obtained from Williams's cell phone carrier showed that, on November 29, 2007, Williams called Jones's cell number at 2:52 p.m., 2:53 p.m., and 3:25 p.m. *Id.*, at 1014–15.

Jones was unable to cash the check, and the bank teller retained it. *Id.*, at 785, 798, 815.[7] Jones left the bank and returned to Williams's car. *Id.*, 790–91. Later that day, at other banks, Jones successfully cashed "numerous" fake checks given to her by Williams. *Id.*, at 814. Williams paid Jones every time she cashed a check for him. *Id.*, at 798.

Hay-Boler met Williams in November 2007, at Mike's Bar & Grill in Rochester. *Id.*, at 633–34. On December 13, 2007, Williams drove Hay-Boler in a silver SUV to a Citizen's Bank branch in Henrietta, New York. *Id.*, at 634. He gave her a check from a "food place" in Rochester that was made out to her; however, she left the bank without cashing that check. *Id.*, at 655–57, 660, 663–64.

Williams drove Hay-Boler to another Citizen's Bank branch in Henrietta. From an envelope he had on his lap, Williams gave her a check in the amount of $931.16 from ETS Staffing Services payable to her. *Id.*, at 634–35. Williams told Hay-Boler that if the bank teller tried to take her identification while she was trying to cash the check, she should "always take it back and leave." *Id.*, at 635.

Hay-Boler had never worked for ETS Staffing and knew she had no right to receive any money from that company. *Id.*, at 640–41.[8] Hay-Boler presented the

---

[7] A representative of the Arc of Monroe County testified that the check was counterfeit. *Id.*, 829–32.

[8] A former ETS Staffing employee testified that the check presented by Hay-Boler to the bank on December 13, 2007, was counterfeit. *Id.*, at 668–70, 675.

check to the bank teller, displayed her identification, endorsed the check, and received cash. *Id.*, at 641.

While she was inside the bank, Hay-Boler received a call from cell phone number 585-739-3390. It was Williams, and he asked her how it was going. *Id.*, at 644–45.[9] After cashing the check, Hay-Boler returned to Williams's car and gave him the check proceeds, out of which he paid her $50. *Id.*, at 641–42. When he asked her to cash another check, Hay-Boler refused and never spoke to him again. *Id.*, at 642.

George Harvey Scott ("Scott")[10] testified that he was introduced to Williams and his nephew, Sherrell Williams ("Sherrell"), in 2006. *Id.*, at 933–934. Soon thereafter, Scott began passing checks with them. *Id.*, at 934.

---

[9] Hay-Boler's cell phone number was 585-957-4044. *Id.*, at 642–43. Petitioner's cell phone records showed that he called her on December 13, 2007, at 1:14 p.m., 1:15 p.m., 1:26 p.m., 1:30 p.m., 1:54 p.m., 1:55 p.m., and 2:25 p.m. *Id.*, at 1015–16.

[10] Scott did not provide testimony supporting the criminal charges at issue in the retrial but instead provided so-called "*Molineux* evidence." Under *People v. Molineux*, 168 N.Y. 264 (1901), a court may admit evidence of defendant's prior crimes or uncharged criminal conduct where it is (1) probative of motive, intent, absence of mistake or accident, common scheme or plan, or identity; and (2) the probative value of that evidence outweighs its prejudicial effect. *Id.* at 293-94. Prior bad acts or uncharged crimes also may be admissible under *Molineux* as necessary background material or to complete the narrative of the events. *People v. Leonard*, 29 N.Y.3d 1, 8 (2017). Here, the trial court held a hearing outside the jury's presence regarding the prosecution's request to have Scott testify about his participation in the check-cashing scheme. Dkt. 20-9, at 142–43. The trial court found that Scott's testimony was "classic *Molineaux* [sic] facts to complete the narrative and [to] let the jury understand what, exactly what's going on before those checks were attempted to be cashed. So I would allow those in." *Id.*

On January 12, 2007, Scott went to 119 Weldon Street, in Rochester, New York. *Id.*, at 935–36. Williams and Sherrell were on the third floor of the house in the finished attic area, which Williams referred to as the "lab." *Id.*, at 936–37. While Scott sat and watched television, Williams and Sherell worked at the computer about ten feet away. *Id.* Scott could hear Williams instructing Sherell how to create checks on the computer and print them out. *Id.*, at 937–39.

Scott recalled that he, Williams, and Sherell cashed "a lot" of checks during the week of January 12 to January 16, 2007. *Id.* at 988–89. On January 16, 2007, Williams and Sherell drove Scott in a gray Chevrolet Equinox SUV to the Webster, New York branch of M&T Bank. *Id.*, at 940–41. Scott went into the bank with a counterfeit check but was arrested once he was inside. *Id.*, at 941. When Scott left the bank in police custody, the gray SUV was gone. *Id.*[11]

Monroe County Sheriff's Office Investigator Scott Peters ("Investigator Peters") testified that, at about 11 a.m. on December 24, 2007, he participated in a traffic stop of Williams's vehicle conducted by members of the New York State Police. *Id.*, at 1033–34. During a pat-down of Williams, a trooper retrieved two checks from the Children's Institute that were inside Williams's jacket. *Id.*, at 1035–36. During a vehicle inventory, the trooper found a folder on the passenger

_____

[11] Scott gave a statement to police and agreed to cooperate with the Monroe County District Attorney's Office in the prosecution of Williams and Sherell. *Id.*, at 942–44. In exchange for his cooperation, Scott pleaded guilty to two counts of second-degree criminal possession of a forged instrument and received concurrent terms of one and one-half to four and one-half years in prison. *Id.*, at 943–45.

seat containing a check from the Children's Institute and some blank check forms. *Id.*, at 1039–1042.[12]

Later that day, Williams was brought to the New York State Police barracks in the Town of Chili. *Id.*, at 1046. At about 12:50 p.m., Investigator Peters read Williams his *Miranda* warnings, and Williams waived his rights and agreed to talk to the police. *Id.*, at 1048–49, 1051. During the interview, Williams was not handcuffed. *Id.*, at 1048. In his written statement, Dkt. 20-7, at 280–81, Williams claimed that Tryn Parker ("Parker")[13] was the leader of the counterfeit check-cashing scheme and had hired Williams to drive people to different banks so they could pass the counterfeit checks. Dkt. 20-9, at 1066. Williams denied any involvement in creating counterfeit checks, recruiting people to cash checks, or receiving check proceeds. Williams claimed that the checks found in his possession had been given to him by a woman who had asked him to give them to Parker. Dkt. 20-7, at 204–205.[14]

---

[12] Williams was not charged in Indictment 446 with possession of the Children's Institute checks. Rather, Investigator Peters' testimony regarding the discovery of these checks was permitted under the *Molineux* rule. *Id.*, at 1058, 1067.

[13] Investigator Peters admitted on cross-examination that he participated in an investigation of Parker that was being conducted by the Monroe County Sheriff's Office's economic crimes task force. *Id.* at 1068–69. As a result of this investigation, Parker was charged with creating the check that Jones attempted to cash at the Key Bank in Perinton, New York. *Id.*, at 1087–88.

[14] Williams's statement was received into evidence, but the trial court denied the prosecutor's request to have Investigator Peters read the statement to the jury. The statement was provided to the jury during their deliberations. Dkt. 20-9, 1066–67.

### 2.    The Defense Case

The two chief witnesses for the defense were Williams and his nephew, Sherrell.  Williams testified that he previously worked part-time as a cook at Mike's Bar & Grill where Parker was a frequent customer.  Dkt. 20-9, at 1230–31. Williams said that whenever Parker came to the restaurant, he would ask to borrow Williams's car or would ask Williams to take somebody to the bank or the store.  *Id.* at 1235–36.  Williams admitted that he drove two women to a bank in Churchville, New York, where the women cashed checks that they received from Parker. Williams stated he was charged and acquitted in connection with this incident.  *Id.,* at 1234–1236.

Williams testified that Parker said he would give Williams $50 to drive people to the bank to cash checks so that they could repay debts owed to Parker.  *Id.* at 1238–39.  Williams said he performed this errand for Parker twice.  After the second occasion, Williams went to 12 Arnett Boulevard to drop off a food order and discovered Parker making counterfeit checks on a computer.  *Id.,* at 1239–40, 1259–61.  Williams then told Parker, "I'm out of it," and said he would not drive people to cash checks anymore.  *Id.,* at 1240, 1261–62.  Two days later, after Williams denied Parker's request to borrow his car, Parker started texting death threats to Williams. *Id.,* at 1240–41, 1261–62.  Williams complained that he notified the police and the Monroe County District Attorney's Office.  Nothing was done to investigate Parker's threats.  *Id.,* at 1240, 1242–43.

14

Williams testified that he was not involved in any of the bank transactions mentioned in the prosecution's direct case, and that he had never passed any counterfeit checks. *Id.*, at 1237–38. He said he had met Scott briefly once when Scott came to William's mother's house with Sherell. *Id.*, at 1256–57, 1291. Williams denied knowing Jones, Ruise, and Hay-Boler. *Id.*, at 1228–29. Williams admitted that 739-3390 was a cell phone number he previously used. *Id.*, at 1304. Williams believed that his phone records showed calls to Jones and Hay-Boler because he used to lend his phone to patrons at the restaurant, including Parker. *Id.*, at 1304–06.

Williams complained that police and prosecutors are harassing him and "setting [him] up" to be the "fall guy" for Parker's counterfeit check-cashing scheme. *Id.*, at 1244, 1248, 1271–75.

Sherell testified that he learned how to make counterfeit checks from Parker and that Scott used to cash checks for him. *Id.*, at 1130–31, 1132–33, 1139. However, Sherell said that Scott had never been to Sherell's residence at 119 Weldon Street. *Id.*, at 1131. As a result of passing bad checks with Scott, Sherell pleaded guilty to charges in Monroe County and Ontario County and received an aggregate sentence of six to twelve years. *Id.*, at 1135–36. The federal authorities subsequently waived prosecution on these charges. *Id.*, at 1134.

According to Sherell, Williams did not participate in creating counterfeit checks at 119 Weldon Street and was never involved with Parker or Scott. *Id.*, at

1138–40, 1144.  Sherell admitted that he and Williams had passed a counterfeit check together once, about thirteen years ago.  *Id.*, at 1147.

### 3.   Verdict and Sentence

The trial court found that Williams was an accomplice as a matter of law and charged the jury on accomplice liability under PL § 20.00.  *Id.*, at 1394–96.  The trial court also instructed the jury on second-degree scheme to defraud as a lesser included offense of Count 15 charging first-degree scheme to defraud. [15]  *Id.*, at 1405, 1408–10.  On June 29, 2015, the jury returned a verdict convicting Williams of Counts 3 and 5 (second-degree criminal possession of a forged instrument), acquitting him of Count 15, and convicting him of the lesser-included offense of second-degree scheme to defraud.  *Id.*, at 1484–87.

The prosecution applied to have Williams adjudicated a persistent felony offender under PL § 70.10, and the trial court held an evidentiary hearing on December 4, 2015, pursuant to CPL § 400.20.  Dkt. 20-9, 1530–1669.  Based on the evidence presented at the hearing, the trial found that Williams was a persistent

---

[15] A person is guilty of first-degree scheme to defraud when, *inter alia*, that person "engages in a scheme constituting a systematic ongoing course of conduct with the intent to defraud more than one person or to obtain property from more than one other person by false or fraudulent pretenses, representations or promises and so obtains property with a value in excess of one thousand dollars from one or more such persons. . . ."  N.Y. Penal Law § 190.65(1)(b).  The prosecution must prove the identity of at least one person from whom the defendant fraudulently obtained property; it need not prove the identity of any other intended victim."  *Id.*, § 190.65(2).  The lesser included offense of second-degree scheme to defraud does not require the prosecution to prove a specific amount of value.  *Id.*, § 190.60(1).  The time-period for the course of conduct in Williams's case spanned from August 30, 2007, to December 20, 2007.  Dkt. 20-7, 102.

16

felony offender as defined in PL § 70.10, and that extended incarceration and lifetime supervision of Williams would best serve the public interest.  Accordingly, the trial court sentenced Williams as a persistent felony offender to an aggregate term of 20 years to life in prison, to be served concurrently with his sentences on convictions obtained under other indictments.  *Id.*, at 1672–74.

### G.  Direct Appeal of the Retrial

Williams represented himself on direct appeal.  Dkt. 20-3, 1–105.  On July 6, 2018, the Fourth Department unanimously affirmed the judgment.  *People v. Williams (Appeal No. 3)*, 163 A.D.3d 1422, 80 N.Y.S.3d 610 (4th Dep't 2018) ("*Williams II*").  The Fourth Department also denied Williams's motion for reargument.  *People v. Williams*, 164 A.D.3d 1671, 82 N.Y.S.3d 754 (Mem.) (4th Dep't 2018).  On October 15, 2019, the New York Court of Appeals denied leave to appeal.  *Id.*, at 284.

### H.  Collateral Motions Attacking the Verdict and Judgment

On September 3, 2015,[16] Williams filed a *pro se* combined motion to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30 and vacate the judgment pursuant to CPL § 440.10.  Dkt. 20-4, at 25.  Williams argued the motion prior to the persistent felony offender hearing and also requested, again, that new counsel be substituted for Attorney Mix.  Dkt. 20-9, 1499–1511.  After the trial court denied the request for substitute counsel, Attorney Mix argued the CPL §

---

[16] Respondent has been unable to locate a copy of this motion.  Dkt. 20-1, at 23 n.22.

330.30 motion on Williams's behalf.  *Id.*, at 1516–1518.  The trial court summarily denied the request to set aside the verdict.  *Id.*, at 1522.

As for the CPL § 440.10 aspect of the motion, the trial court agreed with the prosecutor that it was premature because sentencing had not occurred.  *Id.*, at 1524. The trial court also found that the CPL § 440.10 motion had "no merit" and denied it "in all aspects."  *Id.*

Subsequently, a different judge of the Monroe County Court considered Williams's CPL § 440.10 motion *de novo* and issued an order denying it on April 1, 2016.  Dkt. 20-4, at 25–30.  It is unclear whether Williams sought leave to appeal to the Fourth Department.

Williams filed a second *pro se* CPL § 440.10 motion on August 15, 2018.  Dkt. 20-3, at 285–337.  The Monroe County Court denied the motion on November 8, 2018, on procedural grounds and on the merits.  *Id.*, at 374–77.  The Fourth Department denied leave to appeal on January 8, 2019.  Dkt. 20-4, at 718.

Williams's third *pro se* CPL § 440.10 motion was filed on February 14, 2019. *Id.*, 75–150.  In an order dated April 1, 2019, the Monroe County Court denied the motion on procedural grounds and on the merits.  *Id.*, at 171–73.  The Fourth Department denied leave to appeal.  Dkt. 20-5, at 126.

Williams filed his fourth *pro se* CPL § 440.10 motion on August 9, 2019.  *Id.*, at 127–253.  November 15, 2019, the Monroe County Court issued an order denying the motion on procedural grounds and on the merits.  *Id.*, at 264–69.  Leave to appeal was denied by the Fourth Department on May 11, 2020.  Dkt. 20-7, at 95.

On November 21, 2020, during the pendency of this habeas proceeding,

Williams filed his fifth *pro se* CPL § 440.10 motion. Dkt. 58-2, at 1– 314. The

Monroe County Court rejected the motion on procedural grounds and on the merits.

*Id.*, at 334–37. The Fourth Department denied leave to appeal on April 25, 2022.

*Id.*, at 402.

## II.   THE FEDERAL HABEAS PROCEEDING

### A.   The Petition

The original petition, filed on June 5, 2020, grouped Williams's allegations

under nine different grounds, some of which included factual allegations and legal

theories supporting more than one claim for relief. In Ground One, Williams

claimed that the prosecution violated *Brady v. Maryland,* 373 U.S. 83 (1963), by

withholding Jones and Hay-Boler's cell phone records for November and December

2007. Dkt. 1 at 5–6.[17]

Ground One, along with Grounds Two and Three, also alleged ineffective

assistance of trial counsel. *See* Dkt. 1, at 5–7 (Ground One); *id.*, at 8–11 (Ground

Two); *id.*, at 11–18 (Ground Three). More particularly, Williams claimed that trial

counsel unreasonably failed to: (a) object to the prosecution's failure to provide

petitioner with cell phone records for Jones and Hay-Boler (Ground One); (b) call

Monroe County Sheriff's Office employees Sergeant Phelan and Deputy Luffman,

who allegedly would have admitted to testifying falsely against Williams before an

---

[17] Since some of Williams's pleadings contain multiple sets of page numbers, the
Court will cite to the page numbers automatically generated by CM/ECF and
located in the header of each page.

Ontario County grand jury (Ground Two); (c) impeach Investigator Peters about how many times he arrested Williams for the same criminal conduct (Ground Two); and (d) call his wife, Shanda Williams ("Shanda"); and bank teller Carol MacCubbin ("MacCubbin") as defense witnesses (Ground Three).

In addition to the ineffectiveness claim, Ground Two also asserted an actual innocence claim and a *Brady* claim based on "twenty-six undisclosed items." *Id.*, at 9–10. The *Brady* claim appears to be a reference to the *Brady* claim raised in the CPL § 440.10 motion attacking the original 2009 conviction, which resulted in the disclosure of approximately twenty-five additional documents consisting of police-generated reports and notes.

In Ground Four, Williams asserted that the trial court erroneously allowed the prosecutor to introduce evidence regarding a previously dismissed fourth-degree grand larceny charge (Count 7) that was not represented at the 2015 retrial on Indictment 446. *Id.*, at 18–19.

Ground Five alleged that the grand jury proceeding was defective because the prosecutor allowed multiple witnesses to provide false testimony. *Id.*, at 20–21.

In Ground Six, Williams contended that the prosecutor elicited false testimony from Investigator Peters concerning how many times he arrested Williams. *Id.*, at 22–23.

Ground Seven challenged the propriety of the prosecutor's opening and closing statements. More specifically, Williams asserted that the prosecutor erroneously described him as an organized crime leader; vouched for Scott's

20

credibility; described Williams's nephew, Sherell, as a liar; and referred to Williams as "Ike," the name by which the accomplices knew him. *Id.*, at 24–25.

In Ground Eight, Williams asserted that the trial court erred in denying his motion to substitute new assigned counsel for Attorney Mix. *Id.*, at 26–28.

Ground Nine alleged that the prosecutor who handled the 2009 trial erroneously issued a subpoena duces tecum for Williams's phone records prior to the empanelment of the grand jury. *Id.*, at 29–31.

At the Court's direction, Respondent filed an answer, memorandum of law in opposition, the state court records, and the state court transcripts. *See* Dkt. 20. Williams sought and received permission, Dkt. 27, Dkt. 28, to file a belated reply to Respondent's answer, Dkt. 31.

## B.   Motions to Stay and Amend

Williams filed a motion to have his federal habeas proceeding stayed while he completed litigation of his fifth CPL § 440.10 motion. Dkt. 21. United States Magistrate Judge Michael J. Roemer issued a report and recommendation ("R&R") recommending that the stay motion be granted, Dkt. 35, to which Respondent objected, Dkt. 36. Williams later filed a proposed amended petition, Dkt. 39, a motion to lift the stay, Dkt. 44, a motion for an evidentiary hearing, Dkt. 45, a motion to appoint counsel, Dkt. 47, and a motion to proceed *in forma pauperis*, Dkt. 48.

On December 12, 2022, this Court issued an order rejecting the R&R and denying Williams's request for a stay. Dkt. 51, at 23. The Court granted leave to

proceed *in forma pauperis*, granted leave to amend, and ordered Respondent to file an answer or otherwise respond to the amended petition. *Id.* Finally, the Court held Williams's motion for an evidentiary hearing and appointment of counsel in abeyance pending completion of briefing on the amended petition. *Id.*

## C.   Amended Petition

The amended petition, Dkt. 39, reasserts Grounds One through Nine from the petition, and adds a Ground Ten consisting of multiple different claims for relief. *See* Dkt. 39, at 5–33, 34–39. More specifically, Ground Ten alleges that: (1) Williams's wife, Shanda, and his cousin, Kenneth Miller ("Miller"), are alibi witnesses who establish that he is actually innocent; (2) trial counsel was ineffective for failing to present the alibi witnesses' testimony; and (3) Williams's phone records were improperly obtained from an out-of-state cell phone carrier via a grand jury subpoena.

Respondent filed a memorandum of law in opposition to the amended petition and filed the supplemental state court records. *See* Dkt. 58. Williams filed a motion to strike Respondent's memorandum of law, Dkt. 61, which Respondent opposed, Dkt. 63. Williams filed two sets of replies. *See* Dkts. 66, 67. Williams then sought to remove the New York Attorney General's Office as Respondent's attorney. Dkt. 64. Respondent opposed the motion, Dkt. 69, and filed a letter explaining the belated service of the opposition to the motion for removal, Dkt. 70. Williams replied to Respondent's opposition and Respondent's letter. *See* Dkts. 71, 72.

<u>DISCUSSION</u>

## I.   LIMITATIONS ON HABEAS RELIEF

The statutory authority of federal courts "to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Section 2254(a) permits a federal court to entertain a petition for a writ of habeas corpus filed by "a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis supplied).

Where a claim has been "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), AEDPA provides that a writ of habeas "shall not be granted . . . unless the adjudication of the claim . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts" in light of the record before the state court, 28 U.S.C. § 2254(d)(2). Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"On federal habeas review [under AEDPA], mixed questions of law and fact

. . . are subject to the standard set forth in 28 U.S.C. § 2254(d)(1)." *Overton v.*

*Newton*, 295 F.3d 270, 277 (2d Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362,

400 (2000) (O'Connor, J., concurring)). "For purposes of § 2254(d)(1), 'an

unreasonable application of federal law is different from an incorrect application of

federal law.'" *Harrington*, 562 U.S. at 101 (quoting *Williams*, 362 U.S. at 410).

AEDPA's standard is "difficult to meet," *Harrington*, 562 U.S. at 102, and "highly

deferential," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and

internal quotation marks omitted). "A state court's determination that a claim

lacks merit precludes federal habeas relief so long as 'fair[-]minded jurists could

disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

A state court's factual determinations are considered separately from

applications of constitutional law to fact, *see Rice v. Collins*, 546 U.S. 333, 342

(2006) (stating that "[t]he question whether a state court errs in determining the

facts is a different question from whether it errs in applying the law"), and are

subject to 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1). *Wood v. Allen*, 558 U.S. 290, 293

(2010). To date, however, the Supreme Court has not resolved "the questions of how

and when § 2254(e)(1) applies in challenges to a state court's factual determinations

under § 2254(d)(2)." *Id.*

"AEDPA 'sets forth a precondition to the grant of habeas relief . . . , not an

entitlement to it[.]'" *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (ellipsis in

original) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). Satisfying the standards

in 28 U.S.C. § 2254(d)(1) or § 2254(d)(2) is therefore necessary but not sufficient. *See id.* "[T]he petitioner still 'bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated,'" *id.* (quoting *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012)).

## II.   AMENDED PETITION

### A.   Defects in the Grand Jury Proceeding (Ground Five)

#### 1.   Legal Principles

It is well settled in this Circuit that alleged improprieties during a state grand jury proceeding are not cognizable grounds for federal habeas relief. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989). In *Lopez*, the petitioner complained about the prosecutor's "presentation of prejudicial evidence and error in explaining the law" to the grand jury. *Id.*

The Second Circuit reasoned that, "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury," as the Supreme Court held in *United States v. Mechanik*, 475 U.S. 66 (1986), then "similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court." *Id.* at 32 (citing *Mechanik*, 475 U.S. at 70 ("Measured by the petit jury's verdict, then, any error in the [federal] grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.")). The Second Circuit determined that since the petit jury later convicted Lopez based on proof beyond a reasonable doubt—a higher standard than the

25

probable cause required to issue an indictment—the "error before the grand jury, if any, was harmless." *Id.* at 33.

### 2. Application

In Ground Five, Williams asserts he is entitled to habeas relief because Jones and Dahnielle Reed ("Reed") testified falsely before the grand jury. *See* Dkt. 1, at 20–21; Dkt. 39, at 19–20.[18]  On direct appeal, the Fourth Department rejected the contention that the grand jury proceeding was defective because, "[a]lthough one of the witnesses provided false testimony at the grand jury proceeding relating to count four of the indictment, that count was properly dismissed." *Williams II*, 163 A.D.3d at 1422, 80 N.Y.S.3d 610.  As there was "no indication" that the prosecution knowingly or deliberately presented false testimony before the grand jury, there was "no basis" for finding that the remaining counts were "rendered defective by the alleged false testimony." *Id.*, 163 A.D.3d at 1422–23, 80 N.Y.S.3d 610.  Respondent argues that Ground Five cannot provide a basis for habeas relief because any errors in the grand jury proceeding were rendered harmless by the petit jury's guilty verdict.  Dkt. 20-1, at 38–39 (citing *Lopez*, 865 F.2d at 32–33).

As an initial matter, the counts based on Reed's testimony were dismissed by the trial court prior to jury deliberations.  *See* Dkt. 20-9, 1118–19.  Thus, to the extent that inconsistencies in Reed's grand jury testimony played a part in the

---

[18] Because the amended petition, Dkt. 39, appears to be missing some pages that were in the original petition, Dkt. 1, the Court cites to both documents.

decision to indict, any error was mooted by the trial court's dismissal of the charges supported by Reed's testimony.

Williams is correct that Jones told the grand jury that she was able to cash the fraudulent check that formed the basis for Count 4 when, in fact, Key Bank did not allow her to do cash that check. But as the Fourth Department observed, Count 4 was dismissed with the prosecutor's consent as a result of the CPL § 440.10 motion attacking the 2009 conviction, well before the 2015 retrial. *See* Dkt. 20-4, 7–13.

With regard to the remaining charges in Indictment 446 supported by Jones's testimony, the fact that the petit jury rendered guilty verdicts on them shows that any error in the grand jury's decision to indict was rendered harmless beyond a reasonable doubt. *See, e.g., Hunter v. Annucci*, No. 19-CV-1321 (MKB), 2023 WL 3179698, at *15 (E.D.N.Y. May 1, 2023) ("Petitioner's arguments that the Government induced perjured testimony and withheld 'truthful' evidence in the grand jury proceeding are not cognizable on federal habeas review because this claim was rendered harmless by the petit jury's verdict." (collecting cases)).

Williams's complaints about the grand jury proceeding do not state a cognizable claim for federal habeas relief. Furthermore, the state court did not unreasonably apply, or rule in a manner contrary to, clearly established federal law when it rejected them on appeal. Accordingly, Ground Five does not provide a basis for habeas relief.

B.    **Unauthorized Grand Jury Subpoena (Ground Nine)**

1.    **Legal Principles**

The timing of and procedure for issuing a subpoena duces tecum in
connection with a grand jury proceeding is governed exclusively by New York State
law. *See, e.g., People v. Natal*, 75 N.Y.2d 379, 385, 553 N.E.2d 239, 242 (1990) ("[B]y
statute it is the District Attorney who issues a subpoena duces tecum." (citing N.Y.
Crim. Proc. Law § 610.25(1) ("Where a subpoena duces tecum is issued on
reasonable notice to the person subpoenaed, the court or grand jury shall have the
right to possession of the subpoenaed evidence.  Such evidence may be retained by
the court, grand jury[,] or district attorney on behalf of the grand jury.")); *see
generally Brunswick Hosp. Ctr., Inc. v. Hynes*, 52 N.Y.2d 333, 337, 420 N.E.2d 51,
53 (1981).  The Supreme Court has stated many times that "it is not the province of
a federal habeas court to reexamine state-court determinations on state-law
questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

2.    **Application**

In Ground Nine, Williams complains that, prior to the empanelment of the
grand jury, the prosecutor unlawfully obtained subpoenas for his cell phone records
and his inmate phone calls. *See* Dkt. 1, at 29–30; Dkt. 39, at 29–30.  Williams
raised this claim in his fourth CPL § 440.10 motion.  Dkt. 20-5, at 140.  It was one of
the claims that the state court rejected under CPL § 440.10(3)(c) because it could
have been raised in an earlier motion to vacate.  Dkt. 20-4, at 172.  Because the
claim fails even under a *de novo* standard of review, the Court need not determine

whether there was an "adjudication on the merits" for purposes of 28 U.S.C. §
2254(d).  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny
writs of habeas corpus under § 2254 by engaging in *de novo* review when it is
unclear whether AEDPA deference applies, because a habeas petitioner will not be
entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review,
*see* § 2254(a).").

As an initial matter, Respondent correctly asserts that this claim is not
cognizable on federal habeas review.  Dkt. 20-1, at 38.  The Court agrees that
Ground Nine presents only an issue of state law that cannot form the basis for
federal habeas relief.  *See, e.g., Hall v. Conway*, 630 F. Supp. 2d 283, 294 (W.D.N.Y.
2009) ("[A]ny error in the subpoena process would be a violation of state law only,
and does not raise a constitutional claim." (citing *Estelle*, 502 U.S. at 68)).

Moreover, Williams has not established that Ground Nine has merit as a
matter of state law.  Courts in New York State have rejected claims that
empanelment of the grand jury is a prerequisite for the issuance of a subpoena.  *See,
e.g., Hirschfeld v. City of New York*, 253 A.D.2d 53, 58, 686 N.Y.S.2d 367, 370 (1st
Dep't 1999) (rejecting, as "contrary to the existing authorities on the subject," the
plaintiff's contention that for a "[g]rand [j]ury subpoena to be lawful, the [g]rand
[j]ury must be impanelled [sic] prior to the issuance of the subpoena" and stating
that "[t]here is no requirement that the People open a [g]rand [j]ury proceeding
prior to the return date of a [g]rand [j]ury subpoena").  Because Ground Nine does

not present a cognizable constitutional issue and is, in any event, meritless, it does

not provide a basis for habeas relief.

### C. Denial of Fifth Amendment Privilege Against Self-Incrimination Based on Subpoenas for Phone Records (Ground Ten)

#### 1. Legal Principles

"[T]he Fifth Amendment protects against 'compelled self-incrimination, not

(the disclosure of) private information.'" *Fisher v. United States*, 425 U.S. 391, 401

(1976) (quoting *United States v. Nobles*, 422 U.S. 225, 233 n.7 (1975)); *see also*

*Fisher*, 425 U.S. at 402 (holding that "compelled production of documents from an

attorney does not implicate whatever Fifth Amendment privilege the taxpayer

might have enjoyed from being compelled to produce them himself"); *Couch v.*

*United States*, 409 U.S. 322, 328 (1973) ("The Constitution explicitly prohibits

compelling an accused to bear witness 'against himself'; it necessarily does not

proscribe incriminating statements elicited from another.").

#### 2. Application

In Ground Ten, Williams contends that the prosecutor who handled his 2009

trial committed misconduct by issuing a grand jury subpoena duces tecum for cell

phone records to a wireless carrier in New Jersey to obtain for cell phone records,

thereby violating his Fifth Amendment privilege against being compelled to testify

against himself. Dkt. 39, at 34–37. Williams raised this claim in his fifth CPL §

440.10 motion, citing both state statutory law and the Fifth Amendment. *See* Dkt.

58-2, at 146. The state court rejected it, noting only that the state cases upon which

Williams relied were inapposite because they dealt with judicial subpoenas issued

after indictment and arraignment, not grand jury subpoenas. Dkt. 20-3, at 337–38.

Because the claim fails even under a *de novo* standard of review, the Court need not

determine whether there was an "adjudication on the merits" for purposes of 28

U.S.C. § 2254(d). *See Berghuis*, 560 U.S. at 390.

The Court agrees with Respondent, *see* Dkt. 58, at 16, that Williams has not

stated a Fifth Amendment violation. As made applicable to state defendants

through the Fourteenth Amendment, the Fifth Amendment does not permit

Williams to bar his wireless carrier from complying with the grand jury subpoena

duces tecum for the records that the *wireless carrier* created and maintained

regarding Williams's cell phone account. *See Matter of Grand Jury Subpoenas*

*Dated Oct. 22, 1991, & Nov. 1, 1991*, 959 F.2d 1158, 1163 (2d Cir. 1992) (stating

that "the Fifth Amendment in and of itself would not permit Doe to bar disclosures

by [Doe's law firm] of information given it by Doe" since "[t]he Fifth Amendment

protects a person against compelled self-incrimination, not against the compelled

disclosure of his private information by his attorneys"). The Fifth Amendment

claim alleged in Ground Ten is meritless and does not provide a basis for habeas

relief.

### D. Denial of Motion for Substitute Counsel (Ground Eight)

#### 1. Legal Principles

The Sixth Amendment right to counsel includes "the right of a defendant who

does not require appointed counsel to choose who will represent him." *United States*

*v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). But this "right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151. The Supreme Court "has stated that 'impecunious' defendants have no Sixth Amendment right to choose their counsel." *Soltero v. Kuhlman*, No. 99CIV10765(GEL), 2000 WL 1781657, at *3 (S.D.N.Y. Dec. 4, 2000) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."); *Wheat v. United States*, 486 U.S. 153, 158 (1988) ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers")).

Thus, "[a]bsent a claim of ineffective assistance, the state court's decision to deny [a] petitioner's motion to substitute counsel conflicts neither with any particular Supreme Court decision nor with any general principle of Supreme Court jurisprudence." *Id.* Even for those defendants with retained counsel, the "Sixth Amendment does not guarantee an absolute right to the counsel of one's choosing . . . , a 'meaningful' attorney-client relationship, or complete satisfaction with counsel's performance." *Id.* (citing *Wheat*, 486 U.S. at 158); *Morris v. Slappy*, 461 U.S. 1, 12-15 (1983); *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984)).

Instead, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *Cronic*, 466 U.S. at 657 n.21; *see also Lockhart v. Fretwell*, 506 U.S. 364, 368–69 (1993) (stating that the right to counsel is not recognized for its own sake but to preserve the defendant's right to a fundamentally fair trial). "If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." *Id.* (collecting cases).

### 2.   Application

In Ground Eight, Williams asserts that the trial court erroneously denied his motion, made a few days before jury selection, to replace Attorney Mix. *See* Dkt. 1, at 26–28; Dkt. 39, at 25–27. The Fourth Department rejected this argument, concluding that the trial court "made the requisite minimal inquiry" into Williams's objections, and "properly determined" that there was "no basis" for substituting new counsel or making further inquiry. *Williams II*, 163 A.D.3d at 1423–24, 80 N.Y.S.2d 610 (internal quotation marks and citations omitted). The Fourth Department observed that, "the timing and circumstances of defendant's [request] strongly suggest[ed] that it was a delaying tactic." *Id.* (first alteration in original) (citation omitted).

Respondent argues that this claim is not cognizable on habeas review and, in any event, the state court's adjudication of this claim on the merits was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

law. Dkt. 20-1, at 42–46. The Court agrees that Ground Eight does not provide a basis for habeas relief.

First, as discussed below in this decision and order, Williams has not established that trial counsel was ineffective. To the contrary, the alleged errors assigned to trial counsel are not errors at all. "[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111 (where petitioner's "attorney represented him with vigor and conducted a skillful cross-examination," "elicited concessions from the [prosecution]'s experts[,] and was able to draw attention to weaknesses in their conclusions stemming from the fact that their analyses were conducted long after investigators had left the crime scene," "it would have been reasonable to find that [the petitioner] had not shown his attorney was deficient under *Strickland*"). Notably, Attorney Mix successfully obtained dismissal of all but three counts prior to jury deliberations and secured an acquittal on the felony charged in Count 15.

The record here refutes any suggestion that Williams had "good cause [for substituting new counsel for Attorney Mix], such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981) (internal quotation marks and citations omitted). Even after Williams sought to have him removed from his case, Attorney Mix adopted the bulk of Williams's then-pending *pro se* motions. Attorney Mix constantly conferred with Williams

34

throughout the trial, involving him in what appeared to be every significant tactical and strategic decision.

No matter how liberally Williams's allegations are construed, he has not shown that Attorney Mix's representation detracted from the fundamental fairness of the trial process. In rejecting his substitution-of-counsel claim, the state court did not rule in a manner contrary to, unreasonably apply federal law, or make an unreasonable determination of the facts in light of the evidence presented at trial. Ground Eight accordingly does not warrant habeas relief.

### E. *Brady* Violations (Grounds One and Two)

#### 1. Legal Principles

The suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. There are "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). It is well settled that evidence is not "suppressed" for *Brady* purposes if the petitioner "either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) (internal quotation marks omitted).

2.    **Application**

a.    The Accomplices' Cell Phone Records

In Ground One, Williams claims that the prosecution should have provided him with copies of the cell phone records for two of his accomplices, Hay-Boler and Jones. *See* Dkt. 1, at 5–7; Dkt. 39, at 6–7. According to Williams, these records would have established that neither Hay-Boler nor Jones were inside a bank when they received calls from Williams's cell phone.

Williams raised this allegation in the second CPL § 440.10 motion filed on August 15, 2018. The state court determined that there was no basis upon which to conclude that the accomplices' phone records would have been favorable to Williams and, in any event, they were "equally available" to the prosecution and the defense. Dkt. 20-3, at 376. The state court's alternative holding on the merits constitutes an "adjudication on the merits" owed deference under AEDPA. *See Tatum v. Lempke*, 481 F. App'x 659, 662 (2d Cir. 2012) (summary order) (stating that it "must afford AEDPA deference" to the state court's decision, which found the petitioner's claim to be procedurally barred but also addressed its merits (citing *Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004) (granting AEDPA deference to state court's alternative holding on the merits)).

In light of the evidence presented, the state court reasonably determined the accomplices' cell phone records were equally available to both parties. As Respondent points out, Williams's own cell phone records were introduced at his first trial in 2009, and these records showed that he called the accomplices, Hay-

36

Boler and Jones, while they were inside the banks. *See* Dkt. 20-7, at 229 (prosecution's brief on appeal noting that "[t]he testimony of defendant's accomplices was corroborated by cell phones records showing defendant calling some of his accomplices while they were actually in the banks cashing the checks" (citations to 2009 trial transcript omitted)).  Thus, at the time of the retrial in 2015, Williams had been aware of the existence of his accomplices' phone records for at least six years and was on notice that they might contain relevant information. Williams had ample time during those six years to issue subpoenas for the cell records and review them to see if, in fact, they were favorable to the defense.

Because Williams knew of the "essential facts permitting him to take advantage of any exculpatory evidence," *DiSimone*, 461 F.3d at 197, contained in Hay-Boler's and Jones's cell phone records, that evidence was not "suppressed" for purposes of establishing a *Brady* violation. *See, e.g., United States v. Barcelo*, 628 F. App'x 36, 39 (2d Cir. 2015) (holding that prosecution did not suppress, for *Brady* purposes, cooperating witness's version of stop of defendant's tractor-trailer, which differed from that of two federal agents who testified at suppression hearing in prosecution for conspiracy to distribute cocaine; defendant knew that cooperating witness was present during traffic stop and might have useful evidence); *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (holding that the government was not required to disclose allegedly exculpatory grand jury testimony where the defendant "was on notice of the facts necessary for him to take advantage of such exculpatory testimony as [the identified witnesses] might conceivably furnish").

In rejecting his *Brady* claim, the state court did not rule in a manner contrary to, unreasonably apply federal law, or make an unreasonable determination of the facts in light of the evidence presented at trial. The *Brady* claim in Ground One accordingly does not warrant habeas relief.

**b.** **The Twenty-Six Undisclosed Documents**

Ground Two asserts that the prosecutor failed to provide the defense with "twenty-six undisclosed documents." *See* Dkt. 1, at 9–10; Dkt. 39, at 8–9. As Respondent notes, *see* Dkt. 20-1, at 38, this allegation apparently refers to the same *Brady* claim he raised in the CPL § 440.10 motion to vacate the 2009 judgment. As set forth above in the procedural and factual background, the prosecutor conceded it was unclear whether Williams had received the documents identified in the CPL § 440.10 motion and, out of an "abundance of caution," she turned over twenty-five documents to Williams on September 30, 2011. *See* Dkt. 20-4, at 7–13.

At the outset, it is unclear whether this claim was exhausted for purposes of challenging the 2015 retrial. This Court now has authority under 28 U.S.C. § 2254(b)(2) to deny a petition containing unexhausted claims on the merits. Because the claim is patently meritless, the Court exercises its discretion to bypass the exhaustion issue. *See, e.g., Boddie v. New York State Div. of Parole*, 285 F. Supp. 2d 421, 428 (S.D.N.Y. 2003) (concluding that "thorny issue" of exhaustion in the context of habeas challenge to parole decision "need not be addressed" because underlying claims were clearly without merit).

38

As Respondent points out, Williams apparently acknowledged that he received these documents years before his retrial in 2015. Specifically, at an October 10, 2013 appearance in connection with the retrial, Williams stated that at his first trial, the prosecution had "withheld 26 [sic] documents." Dkt. 20-9, at 9. Although Williams did not identify those documents, he noted that the prosecution had later "returned [sic] that [sic] over." *Id.* It is reasonable to conclude that the documents that were "returned . . . over" are the same documents disclosed by the prosecution to Williams on September 30, 2011, in connection with the CPL § 440.10 motion attacking the 2009 conviction. Additionally, at the retrial, when asked by the trial court as to whether the defense had the documents from the CPL § 440.10 motion, Attorney Mix replied, "We have them now." Dkt. 20-9, at 1209.

In short, the record establishes that, well before his retrial, Williams knew or should have known of the "essential facts," *DiSimone*, 461 F.3d at 197, contained in the "twenty-six undisclosed" documents in time for him to take advantage of any potentially favorable information contained in them. Williams therefore has failed to establish the "suppression" element of a *Brady* violation with regard to the "twenty-six undisclosed" documents. Accordingly, the claim based on these documents does not entitle him to habeas relief.

## F.   Prosecutorial Misconduct in Opening and Closing Statements (Ground Seven)

### 1.   Procedural Default

A federal habeas court "will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the

federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558

U.S. 53, 55 (2009) (alteration in original) (quoting *Coleman v. Thompson*, 501 U.S.

722, 729 (1991)).  This is true "even where the state court has also ruled in the

alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9

(2d Cir. 1990).  To overcome a procedural default conclusion based on the state

court's invocation of an adequate and independent state ground, a habeas petitioner

"must show cause for the default and prejudice, or demonstrate that failure to

consider the claim will result in a miscarriage of justice (i.e., the petitioner is

actually innocent)." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing

*Coleman*, 501 U.S. at 748–50).

Respondent has raised the affirmative defense of procedural default with

regard to three of the four allegations in support of Williams's challenge to the

prosecutor's remarks—that the prosecutor vouched for Scott's credibility; described

Williams and his nephew as liars; and referred to Williams as "Ike."  Dkt. 20-1, at

28–29.  In disposing of those claims, the Fourth Department held that Williams

"failed to object to all but one of the allegedly improper remarks made by the

prosecutor during opening and closing statements, and thus failed to preserve for

our review his contention that he was denied a fair trial by those instances of

alleged prosecutorial misconduct." *Williams II*, 163 A.D.3d at 1423, 80 N.Y.S.3d at

613 (citing N.Y. Crim. Proc. Law § 470.05(2)).  In the alternative, the Fourth

Department concluded that the contentions were "without merit," *id.*, 163 A.D.3d at

1423, 80 N.Y.S.3d at 613.

Respondent argues that the Fourth Department relied on an adequate and independent state ground—failure to preserve through a timely and specific objection, *see* CPL § 470.05(2)—to deny them, and that they are procedurally defaulted notwithstanding the alternative ruling on the merits.

The Supreme Court has observed that it is appropriate to bypass procedural questions to reach the merits of a habeas petition "if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997).  Because the entire prosecutorial misconduct issue is readily denied on the merits, the Court elects to bypass the potentially more complex issue raised by Respondent's assertion of procedural default as an affirmative defense to a portion of that claim.  *See, e.g., Anderson v. Graham*, No. 6:15-cv-06687-MAT, 2018 WL 1428249, at *2 (W.D.N.Y. Mar. 22, 2018) (declining to "resolve the issues raised by [the r]espondent's assertion of the defenses of non-exhaustion and procedural default" and proceeding to decide the claims on the merits) (citing *Lambrix*, 520 U.S. at 525); *see also Ramos-Martinez v. United States*, 638 F.3d 315, 324–25 (1st Cir. 2011) (stating that a court "occasionally may avoid addressing" an "enigmatic threshold issue" where "the outcome on the merits is both clear and favorable to the party advocating the threshold issue") (citing *Lambrix*, 520 U.S. at 525).

## 2.   Legal Principles

The appropriate standard of review "for a claim of prosecutorial misconduct on a writ of habeas corpus is 'the narrow one of due process, and not the broad

exercise of supervisory power.'" *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990)

(quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  "Thus, while the

[prosecution] has a 'duty to refrain from improper methods calculated to produce a

wrongful conviction,'" *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014) (quoting

*Berger v. United States*, 295 U.S. 78, 88 (1935)), "such methods will warrant habeas

relief only if they 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process,'" *id.* (quoting *Darden*, 477 U.S. at 180 (some

internal quotation marks omitted)); *see also Donnelly v. DeChristoforo*, 416 U.S.

637, 647–48 (1974) (vacating grant of habeas relief based on prosecutor's

summation comment that the petitioner and his attorney "had said that they 'hope

that you find him not guilty.  I quite frankly think that they hope that you find him

guilty of something a little less than first-degree murder,'" because lower court's

"result . . . leaves virtually meaningless the distinction between ordinary trial error

of a prosecutor and th[e] sort of egregious misconduct held . . . to amount to a denial

of constitutional due process" in other Supreme Court cases).  The prosecutor's

"statements or conduct must be viewed in context; only by so doing can it be

determined whether the prosecutor's conduct affected the fairness of the trial."

*United States v. Young*, 470 U.S. 1, 11 (1985).

### 3.   Application

Williams first complains about the following portion of the prosecutor's

opening statement:

> What is organized crime?  What makes up a criminal enterprise?  Well,
> first off, obviously is an organization, be it complex or be it simple.  It's

> layers of interconnected people, everyone having their own jobs,
> everyone having their own unique function, everyone working towards
> a common goal, a plan, a team.

Dkt. 2-9, at 558. Trial counsel objected on the basis that the jury had not been

advised that any of the charges were classified as organized crime. *Id.*, at 558–59.

The trial court overruled the objection. *Id.*, at 559.

The Fourth Department held that this remark—the only one preserved by a

timely objection—was a "fair comment on the evidence," and therefore "did not

constitute prosecutorial misconduct." *Williams II*, 163 A.D.3d. at 1423, 80 N.Y.S.2d

610. The Fourth Department's adjudication of this claim on the merits was not

contrary to, or an unreasonable application of, clearly established federal law. Dkt.

20-1, at 33–34.

A prosecutor has "the right . . . to marshal favorable inferences, *see United*

*States v. Wilner*, 523 F.2d 68, 73 (2d Cir. 1975), and in general to make any fair

comments which the evidence supports." *Snow v. Reid*, 619 F. Supp. 579, 583

(S.D.N.Y. 1985). The prosecutor's description in his opening statement of what

constitutes "organized crime"—namely, "layers of interconnected people, everyone

having their own jobs" and "working towards a common goal"—accurately

forecasted the testimony from Jones, Ruise, Hay-Boler, and Scott about how the

check-cashing scheme operated. Scott testified that Williams and Sherell first

created the counterfeit checks on a computer and printer. Then, as described by

Ruise, Jones, and Hay-Boler, Williams provided the counterfeit checks to the

accomplices he had recruited, instructed the accomplices about how to pass the

43

counterfeit checks without getting caught, drove the accomplices to the banks, waited for the accomplices while they cashed the checks, and paid the accomplices a portion of the check-cashing proceeds.

Based on this testimony, the prosecutor reasonably described Williams's check-cashing ring as an organization composed of interconnected layers of people working towards a common goal. The prosecutor refer to matters outside the four corners of the proof or exceed the bounds of fair comment on the evidence. *See, e.g.,* *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986) (prosecutor's use of "iceberg" metaphor to describe criminal enterprise alleged in racketeering prosecution stemming from defendants' alleged involvement in loansharking operation did not deprive defendants of fair trial, despite contention that the metaphor intimated that evidence adduced at trial was only the "tip" of the "iceberg" of other unproven criminal activity, since "iceberg" metaphor was used for the limited purpose of describing the structure of the loansharking operation).

As far as the remaining unpreserved remarks, the Fourth Department alternatively ruled on the merits that they "were either a fair comment on the evidence or a fair response to defendant's summation." *Williams II*, 163 A.D.3d at 1423, 80 N.Y.S.3d at 613. This was a reasonable application of clearly established federal law. Moreover, Williams's allegations largely misstate the record.

First, the prosecutor did not vouch for Scott by stating his personal belief that Scott was credible; instead, he urged the jury to consider Scott's admission that he was "a criminal" as a "mark of forthrightness, of credibility." Dkt. 20-9, at 1378.

Contrary to Williams's contentions, the prosecutor did not refer to matters not in evidence or ask the jury to draw conclusions not fairly inferable from the testimony. Instead, the prosecutor properly asked the jury to evaluate Scott's truthfulness in light of the evidence, including Scott's ability to reveal negative qualities about himself. *See, e.g., United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012) (on summation, the prosecutor characterized the testimony of the government's witnesses as "the truth" or the "absolute truth;" finding no improper vouching where the prosecutor "'did not suggest that [s]he had special knowledge of facts not before the jury'" but "in each of the instances cited . . . as improper, it is clear from context that the [prosecutor] was asserting that the statements in question were true because of specific evidence in the trial record" (first alteration in original) (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)).

Second, the prosecutor did not describe Sherell as a "liar." Indeed, the prosecutor never used that word during his opening or summation. Rather, the prosecutor described Sherell as an "interested witness" based on his close relationship with Williams, Dkt. 20-9, at 1374–75, which accurately reflected Sherell's trial testimony. Sherell admitted that, among other things, he was "[v]ery" close to Williams, who had named him when he was born. *Id.*, at 1146–47. As the trial court later instructed, whether a witness has an interest in the outcome of the proceeding was one of the factors the jury could consider in assessing their credibility. *Id.*, at 1390.

45

Third, the prosecutor did not refer to facts not in evidence or misstate the proof by saying that some of the witnesses knew Williams as "Ike." That statement reflected the witnesses' actual testimony—that they knew him as "Ike" and called him by that name. *Id.*, 575, 633, 779, 933.

Even if the foregoing comments were improper—which they were not—Williams cannot establish that they resulted in "actual prejudice" to the defense, that is, "a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). The evidence of guilt introduced by the prosecution in this case was so overwhelming that there is no possibility that any of the prosecutor's comments, considered singly or together, had any effect on the verdict. *See id.* at 825 (finding harmless error and a failure to demonstrate a substantial or injurious effect where there was "compelling evidence in the prosecution's case . . . [and] the prosecutor's summation comments were both brief and isolated").

Moreover, the trial court explicitly informed the jury that the attorneys' opening and closing statements were merely arguments and not evidence. It is well established that "[a] jury is presumed to follow its instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and there is no basis here to depart from that presumption.

The allegations supporting Ground Seven do not amount to "ordinary trial error of a prosecutor," *Donnelly*, 416 U.S. at 647–48, let alone the "sort of egregious misconduct" that amounts to a denial of due process, *see id.* The state court did not

46

unreasonably apply, or rule in a manner contrary to, clearly established federal law in rejecting the prosecutorial misconduct claim. Ground Seven therefore does not provide a basis for habeas relief.

### G. Prosecutor's Failure to Correct Perjury by Investigator Peters (Ground Six)

#### 1. Legal Principles

The prosecution's use of perjured testimony can violate the due process clause, but only where "'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted in original)). That the "witness actually committed perjury," *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000), is a necessary predicate for a due process claim, *see id.* (holding that "appellants' claim fail[ed] because they have not established that [the witness] committed perjury").

Federal courts have repeatedly held that, "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995). As the Second Circuit has explained:

> [a] witness commits perjury if he gives [1] *false testimony concerning a material matter* with the [2] *willful intent to provide false testimony*, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.

47

*United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (emphases supplied).

"Simple inaccuracies or inconsistencies in testimony do not rise to the level of

perjury." *Id.*

### 2.   Application

Williams asserts that the prosecutor elicited false testimony from

Investigator Peters regarding how many times he placed Williams under arrest for

the same crimes. Dkt. 39, at 21–22. During trial counsel's cross-examination of

Investigator Peters, the following exchange occurred:

> Q.   Investigator, you arrested Mr. Williams multiple times for the
>      same conduct that you were investigating in its totality [sic]
>      under the scheme to defraud; isn't that right?
> A.   It was separate from the scheme to defraud.
> Q.   So you're telling me that you were investigating this scheme to
>      defraud, and that these checks that you arrested him for on
>      multiple days -- or multiple times within about two weeks were
>      not part of the scheme to defraud?
> A.   No, I don't believe they were. I'd have -- like I said, I'd have to
>      see the felony complaint I filed.

Dkt. 20-9, at 1095–96. Trial counsel did not ask Investigator Peters to review any

paperwork and moved on to another line of questioning. *Id.*, at 1096.

Subsequently, trial counsel moved for a mistrial, arguing that in the two

answers quoted above, Investigator Peters had testified untruthfully. *Id.*, at 1216–

22. In the alternative, trial counsel requested that all of Investigator Peters'

testimony be stricken. *Id.*, at 1222–24. Both requests were denied. *Id.*, at 1224.

Williams asserted this claim on direct appeal, but the Fourth Department did

not address it in the order affirming the judgment. Respondent argues that even

though the Fourth Department did not specifically mention the claim, this Court

48

must presume that it adjudicated the claim on the merits for purposes of 28 U.S.C. § 2254(d).  Dkt. 20-1, at 31 (citing *Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.")).

Because the claim fails even under a *de novo* standard of review, the Court need not determine whether there was an "adjudication on the merits" for purposes of 28 U.S.C. § 2254(d).  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").

At the outset, Williams admits that the testimony, although allegedly false, Dkt. 39, at 21, was "not perjury. . . ." *Id.*  That admission aside, Williams has not established the elements of a meritorious due process claim.

With regard to the materiality element, Williams contends that the testimony offered by Investigator Peters "was inconsistent with his investigation and police reports[] and prevented the defense from challenging his credibility. . . ." *Id.*  It is well settled, however, that "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Monteleone*, 257 F.3d at 219.  As Respondent argues, *see* Dkt. 20-1, at 32, it was wholly irrelevant to the question of guilt or

49

innocence how many times Williams was arrested and for what criminal conduct. Thus, Williams cannot establish the materiality element of a perjury claim.

Williams cannot establish "willful intent" because there is no basis in the record to conclude that Investigator Peters was being deliberately untruthful. Investigator Peters admitted on cross-examination that Williams was arrested more than once; he simply could not remember the specific charges underlying each arrest—not surprising given that the arrests occurred approximately eight years prior to the retrial.  Investigator Peters suggested that he could clear up any confusion by reviewing the criminal complaint, but trial counsel did not provide him with that opportunity.  In short, it is apparent from the transcript that Investigator Peters was endeavoring to provide accurate testimony in response to trial counsel's questions but had limited recall due to the passage of time.

Because Williams has not established that Investigator Peters willfully provided false testimony concerning a material matter, he has not established that the investigator committed perjury.  As there was no due process violation, Ground Six does not warrant habeas relief.

### H.   Erroneous Admission of Evidence (Ground Four)

#### 1.   Legal Principles

A federal court may intervene in the state judicial process "only when a constitutional wrong is at stake." *Robinson v. Artus*, 664 F. Supp. 2d 247, 264 (W.D.N.Y. 2009) (citing *Wainwright v. Goode*, 464 U.S. 78, 83 (1983) (per curiam)). "In general, evidentiary rulings by a state court based upon state law do not present

a federal constitutional question upon which habeas relief may be granted." *Id.*

(citing *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court

to reexamine state-court determinations on state-law questions. . . . [A] federal

court is limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States.")).

     In order to determine "whether the effect of state-law evidentiary rulings can

give rise to an 'unreasonable application of [ ] clearly established Federal law,' 28

U.S.C. § 2254(d)(1)," *Bell v. Ercole*, 368 F. App'x 216, 218 (2d Cir. 2010) (brackets in

original), "a district court must first 'start with the propriety of the trial court's

evidentiary ruling.'" *Id.* (quoting *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir.

2006)). Even if the state court "misapplied state evidentiary law in a state criminal

case, habeas relief is not warranted unless the erroneous admission of evidence

actually rises to the level of constitutional error so as to deprive the defendant of a

fundamentally fair trial, and, as a result, of due process of law." *Robinson*, 664 F.

Supp. 2d at 264 (citing *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983)).

### 2.  Application

     Williams asserts that the prosecutor was erroneously permitted to introduce

evidence regarding a previously dismissed fourth-degree larceny charge (Count 7).

As noted above, Count 7 charged fourth-degree larceny and was based on Hay-

Boler's cashing of a check for $931.16 from ETS Staffing at Citizen's Bank. At the

trial in 2009, Count 7 was reduced to petit larceny because the ETS check cashed by

Hay-Boler was for a value less than one thousand dollars.

At the retrial in 2015, the prosecution did not re-present a larceny charge based on the ETS Staffing check cashed by Hay-Boler.  Consequently, Williams argues, the prosecutor should not have been permitted to introduce any of Hay-Boler's testimony at the retrial.

When he raised this issue on direct appeal, the Fourth Department rejected the contention that Williams's right to a fair trial was violated, explaining that Hay-Boler's testimony regarding the ETS Staffing check "was relevant to the crimes charged in counts 5 and 15 of the indictment and was therefore properly admitted at trial." *Williams II*, 163 A.D.3d at 1422, 80 N.Y.S.3d 610.

Although Williams and Respondent characterize this as a prosecutorial misconduct claim, the Fourth Department analyzed it as a claim that the trial court erroneously admitted certain evidence.  The Court agrees that it is more accurately analyzed as such.  The Fourth Department's rejection of the claim was not erroneous as a matter of New York State law and did not violate Williams's due process right to a fair trial.

As a matter of New York law, "all relevant evidence is admissible unless its admission violates some exclusionary rule." *People v. Frumusa*, 29 N.Y.3d 364, 370 (2017) (quoting *People v. Harris*, 26 N.Y.3d 1, 5 (2015)).  "Evidence is relevant if it has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence." *People v. Scarola*, 71 N.Y.2d 769, 777 (1988).

Hay-Boler testified that, at Williams's behest, she presented the ETS Staffing check for $931.16 at Citizen's Bank on December 13, 2007, even though she knew it was fake; that she cashed that check and received $931.16; and that she gave the proceeds to Williams. This testimony clearly was relevant to proving Williams's guilt as an accomplice to Count 5 (second-degree possession of a forged instrument based on the ETS Staffing check) and Count 15 (first-degree scheme to defraud).

Williams has not identified any "exclusionary rule," *Frumusa*, 29 N.Y.3d at 370, or constitutional right that was violated by the admission of Hay-Boler's testimony; instead, he simply complains that the evidence was prejudicial because it implicated him in a crime. But "the admission of prejudicial evidence, without more, cannot be unconstitutional." *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001). "All evidence introduced against a criminal defendant might be said to be prejudicial if it tends to prove the prosecution's case." *Id.* Where, as here, "the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Estelle*, 502 U.S. at 69), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012).

Williams has not identified an error of state law in the trial court's evidentiary ruling, much less a constitutional error warranting federal intervention through habeas corpus. *See Cunningham v. Conway*, 717 F. Supp. 2d 339, 360 (W.D.N.Y. 2010) (denying habeas relief because the petitioner did not demonstrate that "the allegedly-erroneous state court evidentiary rulings violated an identifiable

constitutional right." (citing *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988)).

Ground Four accordingly does not provide a basis for habeas relief.

## I.    Actual Innocence (Grounds Two and Ten)

### 1.    Legal Principles

Claims of "actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Instead, "federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim," *id.* at 416–17, but as a "gateway claim," *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), that allows a habeas petitioner to "have an independent constitutional claim considered on the merits." *Herrera*, 506 U.S. at 416–17. For instance, a "gateway claim" of actual innocence may be used to overcome the procedural default of a constitutional claim or to equitably toll the AEDPA's statute of limitations so that an otherwise untimely petition may be heard. *McQuiggin*, 569 U.S. at 386.

To date, however, the Supreme Court "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *Id.* at 392 (citing *Herrera*, 506 U.S. at 404–05). Assuming a freestanding actual innocence claim were cognizable in a non-capital habeas proceeding, the required showing likely would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in *Herrera* and *Schlup*—

54

first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible" and "compelling." 513 U.S. at 324-25. "Credible" means that the petitioner has supported the claim by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "Because *Schlup* explicitly states that the proffered evidence must be reliable, the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (citing *Schlup*, 513 U.S. at 327–28). "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence." *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019).

To meet the "compelling" prong, the petitioner must demonstrate that, "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. "*Schlup* unequivocally requires that reviewing courts consider a petitioner's claim in light of the evidence in the record as a whole, including evidence that might have been inadmissible at trial." *Menefee*, 391 F.3d at 162. "Only after examining

all evidence is the court able to determine whether new evidence truly throws the

petitioner's conviction into doubt, or whether it is so overwhelmed by the weight of

other evidence that it is insufficient to raise a question as to a petitioner's factual

innocence." *Id.*  It bears emphasizing that *Schlup* is concerned with "factual

innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614,

623–24 (1998).

### 2.   Application

#### a.   Documentation from a 2008 Ontario County Prosecution (Ground Two)

Williams raises an actual innocence claim in Ground Two based on police

paperwork and grand jury testimony that he received concerning a 2008 grand jury

proceeding in Ontario County. *See* Dkt. 1, at 8–10; Dkt. 39, at 7–9.  According to

Williams, this documentation would have convinced the jury that his prosecution on

Indictment 446 was based on fabricated evidence and fraudulent testimony.  These

allegations are related to his ineffectiveness claim, also asserted in Ground Two,

based on trial counsel's failure to call Sergeant Phelan and Deputy Luffman of the

Monroe County Sheriff's Office, who allegedly provided false testimony at an

Ontario County grand jury proceeding unrelated to the convictions at issue in this

habeas proceeding.  In particular, Williams believes that Sergeant Phelan and

Deputy Luffman testified falsely about certain counterfeit checks and presented

fabricated fingerprint evidence, which led to the Ontario County grand jury

returning an indictment against him. *See* Dkt. 39, at 8–9.  According to Williams,

the alleged misconduct by Sergeant Phelan and Deputy Luffman before the Ontario

County grand jury would have bolstered his "frame up" defense in the Monroe County prosecution—that he was framed by multiple prosecutorial and law enforcement agencies and made the "fall guy" for Parker's crimes. (*See, e.g.*, Dkt. 20-4, 122–30.

 Williams presented the actual innocence claim based on the 2008 documentation in his third CPL § 440.10 motion. *See* Dkt. 20-4, 75–150. The state court rejected it as unsubstantiated. *See id.*, at 172–73 ("Defendant has not made a requisite *prima facie* showing of actual innocence and has not provided 'sworn allegations substantiating or tending to substantiate all the essential facts' for his claim of actual innocence.")).

 The documentation from the 2008 Ontario County prosecution is considered "new," since it was not presented to the jury at the 2015 retrial. *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (stating that "new evidence" is "evidence not heard by the jury"). However, "latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing" of actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992). Thus, even assuming it is "credible," to the extent it consists of documents generated in court proceedings, it fails the "compelling" prong of the *Schlup* test.

 First, because the documentation concerns an entirely separate criminal proceeding, it is irrelevant to Williams's guilt or innocence of the charges contained in Indictment 446. Thus, it does not "directly support[] [Williams's] factual innocence by indicating either that he did not commit, or could not have committed,

the crimes of conviction." *Hyman*, 927 F.3d at 665 (emphases removed).  Second, the evidence of Williams's guilt at the retrial was supplied largely by civilian witnesses (*e.g.*, his accomplices and the financial victims of his fraudulent activities) rather than law enforcement witnesses.  The 2008 documentation does nothing to undermine the credibility of those civilian witnesses—or, for that matter, the law enforcement witnesses.  In short, it is unlikely to the point of impossibility that "any reasonable juror would have reasonable doubt," *House*, 547 U.S. at 538, about his guilt had the documentation regarding the Ontario County prosecution been presented at the retrial.

Moreover, because the Supreme Court has never held that actual innocence can afford substantive habeas relief, the state court's rejection of this claim cannot be contrary to clearly established Supreme Court precedent.  Furthermore, the state court's decision did not unreasonably apply the Supreme Court's cases concerning gateway and freestanding actual innocence claims, or result in an unreasonable determination of the facts in light of the evidence presented.  Indeed, the evidence proffered in support of the actual innocence claim in Ground Two does not come close to meeting the *Schlup* standard for a gateway actual innocence claim.  Thus, it necessarily cannot meet the more demanding standard that a freestanding actual innocence claim would require, were such a claim a cognizable basis for substantive habeas relief.  *See House*, 547 U.S. at 555 (finding that "[t]o be sure, [the petitioner] has cast considerable doubt on his guilt—doubt sufficient to satisfy *Schlup*'s gateway standard for obtaining federal review despite a state procedural default,"

but "[his] showing falls short of the threshold implied in *Herrera*" for a freestanding actual innocence claim). Even assuming that the actual innocence claim in Ground Two is cognizable, it is nevertheless meritless and does not provide a basis for habeas relief.

### b.    The Alibi Witnesses

Williams asserts another actual innocence claim in Ground Ten, primarily based on an affidavit signed by his cousin, Kenneth Miller ("Miller") on October 16, 2020, Dkt. 58-2, at 116–21, and supplemented by an affidavit dated October 5, 2020, signed by his wife, Shanda, *Id.*, at 123–28.[19] According to Williams, Miller provides him with an alibi for November 29, 2007, and December 13, 2007, because the two were working together from 10:30 a.m. until at least 10 p.m. at Mike's Bar and Grill, where Williams employed him as a prep cook. *Id.*, at 117–18. Miller says that Williams would pick him up at 10:30 a.m. and drive him to the restaurant, and the two would be together in the kitchen until at least 10 p.m. *Id.* Miller asserts that Williams "was unable to leave the restaurant" at any point on the dates in question because it was "too busy." *Id.*, at 118, 120.

Shanda says that, on November 29, 2007, and December 13, 2007, "Kenny" (presumably Miller) was working for Williams as a prep cook at Mike's Bar and Grill, that Williams worked from 11 a.m. to midnight on those dates, and that Williams could not leave the restaurant because it was so busy. *Id.*, at 124.

---

[19] Shanda's affidavit is mainly concerned with his claim that the prosecutor who handled the 2009 trial improperly issued a subpoena to Williams's wireless carrier for his cell phone records. Dkt. 58-2, 125–28.

However, there is no indication that Shanda was at the restaurant on those dates. *See id.*

To explain the delay in obtaining Miller's affidavit, Williams filed an affidavit asserting that he did not know how to contact his cousin. *See id.*, at 132–34, 138, 142–43. He also faulted trial counsel and six of his previous attorneys for failing to investigate his alibi defense; however, he did not offer affidavits from any of them. Williams claimed that in 2009 and 2014, he retained private investigators to locate Miller, but they were unsuccessful. *Id.*, at 139. He also asserted, contradictorily, that "no private investigator would work on [his] behalf due to the mass amount of corruption" in the Monroe County District Attorney's Office and Sheriff's Department. *Id.*, at 140.

Williams presented his actual innocence claim based on newly discovered alibi evidence in his fifth CPL § 440.10 motion. *Id.*, at 1–314. The state court rejected it on procedural grounds because Williams could have raised it in an earlier motion to vacate and, in the alternative, because it was unsubstantiated. *Id.*, at 336. According to the state court, it "strains credulity" to believe that Miller, "more than twelve years" later, "has a precise recollection" of Williams's whereabouts on the dates in question. *Id.* The state court found that Miller's affidavit "at best provides a general recollection of the time period in question" and "has limited evidentiary value because many of the paragraphs are sworn to upon information and belief without stating the grounds or source for the information and belief." *Id.* And "[p]erhaps most importantly," the state court found that Miller's affidavit "does

60

not offer conclusive proof that he has an actual recollection of being with the defendant during the time period" the crimes were committed. *Id.*

Because the state court made factual findings, including assessments of witness credibility, this Court owes deference to them under the AEDPA's provisions dealing with factual determinations, 28 U.S.C. § 2254(d)(2) and (e)(1). *See Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003) ("Credibility determinations are properly within the province of the state court."); *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (stating that the presumption of correctness in 28 U.S.C. § 2254(e)(1) "is particularly important when reviewing the trial court's assessment of witness credibility").

An alibi defense was never presented at Williams's trial. Thus, the affidavits from Miller and Shanda constitute new evidence. *See, e.g., Rivas*, 687 F.3d at 543 (stating that "new evidence" under *Schlup* is "evidence not heard by the jury"). The Court next must consider whether the new evidence is credible *and* compelling. As discussed below, it is neither.

When evaluating a new witness's testimony, a court should "consider the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or presumptions that crediting particular testimony would require." *Menefee*, 391 F.3d at 164–65. As the trial court instructed the jury at Williams's trial, whether a witness has an interest in the outcome of the proceeding—that is, whether they had a motive to testify in

61

favor of one particular side or the other—is a factor to be considered in assessing their credibility.  Dkt. 20-9, at 1390.

Miller is Williams's maternal second cousin; Shanda is Williams's wife.  As Williams's family members, they clearly had an interest in seeing him released from custody.  The fact that family members provided Williams's alibi evidence comes from family members greatly undermines its reliability.  *See Philbert v. Brown,* No. 1:11-CV-1805 NGG, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) ("The identity of the affiants is highly relevant to this inquiry-—a reasonable juror would likely question the credibility of the affidavits, as they were provided by Philbert's girlfriend and his girlfriend's mother." (citing *Lawrence v. Greene,* No. 06–CV–0202 (DLI), 2011 WL 1327128, at *7 (E.D.N.Y. Mar. 31, 2011) ("Even if the alibi evidence had been introduced at trial, a reasonable juror would likely question whether the alibi affidavits obtained by Petitioner in fact came from trustworthy sources, as they were provided by Petitioner's sister, girlfriend and co-defendant as opposed to unbiased parties."))  Indeed, "courts generally hold alibi affidavits from relatives insufficiently credible to compel a reasonable juror to acquit," *Dunbar v. Griffin*, No. 11-CV-5858, 2022 WL 36366, at *6 (E.D.N.Y. Jan. 4, 2022) (collecting cases), "due to concerns that these types of witnesses '[o]bviously . . . have reason to lie to protect petitioner.'"  *Id.* (alteration and ellipsis in original) (quoting *Garcia v. Portuondo,* 334 F. Supp. 2d 446, 456 (S.D.N.Y. 2004)); *see also Goodman v. Collado*, No. 18-CV-2769 (ENV), 2021 WL 4893676, at *6 (E.D.N.Y. Oct. 20, 2021) (finding that new

affidavits showed only that alibi witnesses were the petitioner's "friends, making them interested witnesses and providing reason to find their testimony unreliable").

Next, the record lacks corroboration of the information in Miller and Shanda's affidavits. Although Miller positively stated that he "was with [Williams] at Mike's Bar & Grill" on November 29, 2007, and December 13, 2007, for "that entire day working at the restaurant[,]" Dkt. 58-2, at 120, he does not provide any details that would lend veracity to his claimed recollection of two routine workdays over twelve years ago. If Mike's Bar & Grill was as busy as Miller and Shanda described, it is reasonable to expect there to have been other patrons or employees who could provide at least some information corroborating Miller's account of those days and Williams's whereabouts. Further, to the extent Miller offered any details about the dates in question, such as the make, model, and color of the car Williams was driving, it was only "upon information and belief." *Id.*, at 118–19. Moreover, the fact that Miller may have known what kind of car Williams was driving does not establish that Miller actually was in Williams's presence all day long, as he claims.

Shanda's affidavit is vague and appears to be made upon information and belief about Williams's usual routine—what he typically would do, and how busy Mike's Bar and Grill typically was—not her direct observations of him on the dates in question. *Id.*, at 123–34. The reliability of Shanda's affidavit is further marred by her earlier, conflicting statements. As Respondent points out, in 2019, Shanda provided an affidavit stating that she had Williams's car on the dates in question,

63

contradicting Miller's claim that Williams picked him up for work and drove him home.

Unexplained delay "in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin*, 569 U.S. at 399. The state court reasonably concluded that Miller's affidavit was unbelievable, given that Williams did not present it until over twelve years after the relevant dates. *See Fabers v. Lamanna*, No. 18-CV-2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020) ("The reliability of Joseph's affidavit is further undermined by the fact that it was provided more than six years after the events in question." (citing *Rosario v. Ercole*, 582 F. Supp. 2d 541, 601 (S.D.N.Y. 2008) ("[W]hile the prosecution's witnesses testified to events that occurred over two years prior, petitioner's post-conviction hearing witnesses testified to events that occurred about six years prior. . . .[S]ix-year[-]old memories are inherently not as reliable as two and a half-year[-]old ones."), *aff'd*, 601 F.3d 118 (2d Cir. 2010); *Fernandez v. Annucci*, No. 17-CV-3943(JMA), 2019 WL 1025816, at *5 (E.D.N.Y. Mar. 4, 2019) (seventeen-year delay between the trial and the date of the alibi affidavit "severely undermine[d]" the claim of actual innocence).

The state court found as a fact that Williams "failed to provide a reasonable explanation" for the delay, noting that he "was perfectly capable of contacting his second cousin and asking him to testify at trial." *Id.*, at 335. As the state court pointed out, the delay was "especially" unreasonable "given the potential significance of Mr. Miller's testimony." *Id.* Similarly, Shanda did not offer any

explanation why she changed her story from her 2019 affidavit, in which she merely claimed that she—not Williams—used Williams's phone to call the accomplices on the dates they were passing counterfeit checks.  Notably, Shanda fails to mention Miller or any potential alibi defense in her 2019 affidavit.  It is simply not credible that Shanda would have omitted to mention the existence of a witness who, according to Williams, completely exonerates him.  Moreover, Williams offered a version of the restaurant alibi defense at trial but, again, Miller is conspicuously absent.

Even if Miller and Shanda testified exactly as their affidavits state, a reasonable juror would have to weigh it against *all* of the evidence.  Since Williams raised another actual innocence claim in Ground Two based on the documentation from the 2008 Ontario County proceeding, the Court includes that evidence also.  And, of course, the Court includes the evidence offered at trial.  The 2008 Ontario County documentation and Miller and Shanda's belated, vague, and interested testimony had marginal value, at best, when assayed against the detailed and consistent evidence offered by the prosecution's witnesses.  This includes, but is not limited to, the testimony from Williams's accomplices and crime victims, along with documentary evidence and cell phone records corroborating that testimony.  Williams has failed to show that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt," *House*, 547 U.S. at 538.

65

In sum, because the Supreme Court has never held that actual innocence can afford substantive habeas relief, the state court's rejection of this claim was not contrary to clearly established Supreme Court precedent. Furthermore, the state court's decision did not unreasonably apply the Supreme Court's cases concerning gateway and freestanding actual innocence claims, or result in an unreasonable determination of the facts in light of the evidence presented. Because the alibi evidence supporting Ground Ten does not fulfill the *Schlup* standard for a gateway actual innocence claim, it necessarily cannot meet the more demanding standard that a freestanding actual innocence claim would require, were such a claim a cognizable basis for substantive habeas relief. Even assuming that the actual innocence claim in Ground Ten is cognizable, it is nevertheless meritless and does not provide a basis for habeas relief.

### J.   Ineffective Assistance of Trial Counsel (Grounds One, Two, Three, and Ten)

#### 1.   Legal Principles

To succeed on a claim that he was denied his Sixth Amendment right to the effective assistance of counsel, a petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,'" *Harrington*, 562 U.S. at 111 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)),

"it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Id.*

"Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Id.* at 105.  Where a state court has rejected an ineffective assistance claim on the merits, triggering the application of 28 U.S.C. § 2254(d), the standard of review is "doubly deferential," *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021).

### 2.   Application

#### a.   Failure to Object to *Brady* Violation (Ground One)

In Ground One, Williams faults trial counsel for failing to request a sanction for the alleged *Brady* violation based on the prosecution's failure to disclose Jones and Hay-Boler's cell phone records.  When he raised this claim in the second 440 motion, the state court rejected it on procedural grounds because Williams was in a position to raise it in the first 440 motion but unjustifiably failed to do so.  Dkt. 20-3, at 376 (citing N.Y. Crim. Proc. Law § 440.10(3)(c)).  Alternatively, the state court denied the claim on the merits, reasoning that, since there was no *Brady* violation, there was "no issue as to counsel's failure to request a sanction," because "it is well settled that effective assistance of counsel is not denied 'merely because counsel does not make a motion or argument that has little or no chance of success.'" *Id.*, at 376 (quoting *Williams II*, 163 A.D.3d at 1423, 80 N.Y.S.3d 610)).

As the state court determined, "[t]he failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which

[the] [p]etitioner [is] entitled." *Aparicio v. Artuz*, 269 F. 3d 78, 99 (2d Cir. 2001) (quoting *Jameson v. Coughlin*, 22 F.3d 427, 429-30 (2d Cir. 1994)).  The underlying *Brady* claim based on the accomplices' cell phone records is meritless because, as discussed above, those records were not suppressed by the prosecutor.  Trial counsel thus did not act unreasonably in declining to object or request a sanction.

Nor did trial counsel's decision prejudice the defense since there is no reasonable possibility, let alone reasonable probability, that the trial court would have sustained the objection or imposed a sanction based on a non-existent *Brady* violation.  *See, e.g., Hamilton v. Lee*, 94 F. Supp. 3d 460, 478 (E.D.N.Y. 2015), *aff'd*, 707 F. App'x 12 (2d Cir. 2017) (rejecting habeas petitioner's argument that "trial counsel was ineffective for not requesting sanctions for alleged *Brady* violations" as "without merit since no *Brady* violations have been established"); *Singh v. Greene*, No. 10-CV-4444 JFB, 2011 WL 2009309, at *29 (E.D.N.Y. May 20, 2011) (trial counsel did not prejudice defense by failing to request adjournment or mistrial in light of alleged *Brady* violation where evidence was neither suppressed nor material; state court "would have likely denied a defense motion for mistrial or adjournment, meaning there is no reasonable probability that making such a motion would have affected the outcome of the trial").

The state court's rejection of the ineffectiveness claim in Ground One was not contrary to or an unreasonable application of *Strickland*.  Accordingly, it does not provide a basis for habeas relief.

b.      Failure to Call Police Witnesses (Ground Two)

In Ground Two, Williams asserts that trial counsel erred in failing to call Sergeant Phelan and Deputy Luffman of the Monroe County Sheriff's Office.  He alleges that they provided false testimony at an Ontario County grand jury proceeding unrelated to the convictions at issue in this habeas proceeding. Williams also contends that trial counsel failed to use Sergeant Phelan and Deputy Luffman's purportedly false grand jury testimony to impeach Monroe County Sheriff's Investigator Peters.  *See, e.g.,* Dkt. 20-4, at 87–88.  In particular, Williams claims that trial counsel would have been able to use this impeachment evidence to prove that Investigator Peters arrested Williams multiple times for the same criminal conduct, which, in turn, would prove that the Monroe County Sheriff's Office had a vendetta against him and framed him for Parker's crimes.

When he raised this claim in the third 440 motion, the state court denied it pursuant to CPL § 440.10(3)(c) because it could have been, but was not, raised in the previous two motions to vacate. Dkt. 20-4, at 171–73.  Alternatively, the state court determined that the allegations against trial counsel were unsubstantiated and dismissed the ineffective assistance claim as meritless.  *Id.*

The decision not to call a particular witness "is typically a question of trial strategy that appellate courts are ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam).  Thus, "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219

F.3d 192, 201 (2d Cir. 2000).  A petitioner "does not show that he was prejudiced by trial counsel's failure to call witnesses merely by asserting that they might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at *20 (W.D.N.Y. Oct. 23, 2007) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  "[I]n order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.* at *22 (citing *Alexander*, 775 F.2d at 602).

Williams has supplied no proof that Sergeant Phelan and Deputy Luffman testified falsely before the Ontario County grand jury or presented manufactured evidence.  Instead, he relies exclusively on self-serving and unsupported conspiracy theories.  "Federal courts 'have no obligation to entertain pure speculation and conjecture.'" *Scott v. Racette*, No. 1:15-CV-00043-MAT, 2018 WL 451825, at *15 (W.D.N.Y. Jan. 17, 2018) (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011)); *see also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support").  The speculative nature of Williams's allegations, standing alone, is a sufficient basis for rejecting this claim.  *See Scott*, 2018 WL 451825, at *15 (rejecting the habeas petitioner's "claims of pervasive misconduct by multiple law enforcement agencies, amounting to no less than a conspiracy to unjustly

incarcerate him," because they were "based upon rank speculation with no record support") (collecting cases).

Even assuming for the sake of argument that Sergeant Phelan and Deputy Luffman provided untruthful testimony to an Ontario County grand jury regarding Ontario County criminal charges, Williams has provided no assurances from these witnesses that, in fact, they would have testified in his favor at the retrial. Williams therefore is unable to show prejudice as a result of trial counsel's decision not to pursue these individuals as witnesses.

The state court did not rule in a manner contrary to or unreasonably apply *Strickland*'s principles in rejecting the ineffectiveness claim in Ground Two. Therefore, it does not provide a basis for habeas relief.

### c. Failure to Call Witnesses and Introduce Phone Records (Ground Three)

In Ground Three, Williams claims that trial counsel erroneously failed to (1) call Shanda and MacCubbin as witnesses and (2) introduce his cell phone records as part of his defense at trial. Williams presented these ineffectiveness claims in the fourth CPL § 440.10 motion. In support, he submitted an affidavit from Shanda dated July 17, 2019. Dkt. 20-5, at 310–23, averring that she possessed Williams's cell phone and car on November 29, 2007, and December 13, 2007. Shanda claimed that she redialed numbers in her husband's cell phone, believing them to belong to his girlfriends, and reached Hay-Boler and Jones. Shanda concealed this information for eleven years because she was angry at Williams for his infidelity. Williams asserts that Shanda's testimony would have shown that it was she, rather

71

than Williams's, who placed the phone calls to Jones and Hay-Boler while they were cashing counterfeit checks on November 29, 2007, and December 13, 2007.

Williams also submitted MacCubbin's police deposition dated December 4, 2007, stating that on November 16, 2007, she learned of a "scam" involving a "black female" named "Tameka Jones" who was trying to cash counterfeit checks. Dkt. 20-6, at 174. MacCubbin said that Key Bank had circulated to its employees some photographs of Jones as she attempted to cash counterfeit checks at one of its branches. On November 29, 2007, "at about 2:14 p.m.," a black female presented herself at MacCubbin's teller window and presented a check payable to "Tameka Jones" from the Arc of Monroe for $961.11, and displayed identification in the name of "Tameka Jones." MacCubbin immediately suspected that the customer was Jones and went to discuss the matter with her manager. After that discussion, MacCubbin returned and told the customer that she needed to present another form of identification. The customer replied that she would get another form of identification from her car; MacCubbin said she would hold onto the check. *Id.* The customer took her identification, left the bank, and got into the back-seat of a silver-colored SUV, which drove away. *Id.*

Williams contends that MacCubbin would have provided favorable testimony, specifically, that Jones entered the bank branch at "about 2:14 p.m.," which was thirty-eight minutes before Jones received a call from Williams's cell phone. According to Williams, this discrepancy shows that Jones had not been inside the

72

bank attempting to pass a counterfeit check when she received calls from Williams's cell phone.

The state court denied these ineffectiveness claims pursuant to CPL § 440.10(3)(c) because Williams could have raised them in one of his previous motions to vacate. Dkt. 20-5, at 265. Alternatively, the state court found that trial counsel provided meaningful assistance. *Id.*, at 266.

Williams has not shown that trial counsel acted unreasonably in declining to call Shanda. When evaluating an attorney's strategic decisions, *Strickland* instructs the reviewing court to "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. At the time of trial, counsel had no inkling that Shanda had allegedly helpful information to offer. According to her affidavit, Shanda kept that information secret for many years out of spite. Not even Williams knew of Shanda's purportedly favorable testimony. Trial counsel cannot have been objectively unreasonable in declining to pursue her as a witness under these circumstances.

Williams also cannot show prejudice because there is no possibility that, had trial counsel called Shanda, there would have been a different verdict. Even discounting Shanda's status as a highly interested witness, her belated and uncorroborated story about the phone calls would not have caused the jury to reject the mountain of incriminating evidence offered by the prosecution's numerous disinterested witnesses.

Trial counsel likewise did not act unreasonably in declining to call MacCubbin as a defense witness. As Respondent points out, Dkt. 20-1, at 45, MacCubbin did not state that Jones entered the bank at exactly 2:14 p.m.; rather, it was "about" 2:14 p.m. In any event, the bulk of MacCubbin's deposition was not helpful to the defense. MacCubbin recognized Jones immediately from the bank flyer and suspected her of trying to cash a fake check. MacCubbin's description of Jones's behavior corroborated Jones's testimony about what had happened at that bank. MacCubbin said that after she did not allow Jones to cash the check and asked for additional identification, Jones took back her identification, left the bank, and got into a gray SUV. MacCubbin's observations showed that Jones followed Williams's instructions to his accomplices regarding how to act when confronted by a skeptical bank teller. Calling MacCubbin as a witness thus entailed a substantial risk, and there is no possibility her testimony would have resulted in a more favorable verdict. Williams has not shown that trial counsel's strategic decision prejudiced the defense.

Because the state court correctly applied *Strickland*'s principles in rejecting the ineffective assistance claim asserted in Ground Three, Williams cannot satisfy 28 U.S.C. § 2254(d)(1). He is not entitled to habeas relief on Ground One.

### d.   Failure to Investigate Alibi Witnesses (Ground Ten)

In support of his fifth CPL § 440.10 motion, Williams asserted a claim that trial counsel was ineffective for failing to investigate his alibi witnesses. *See, e.g.*, Dkt. 58-2, 130–43. The state court apparently included this claim among those

"other claims [that] [were] denied" because Williams "was in a position to raise those issues in his previous motions, and failed to do so, or raised them and they were previously denied." *Id.*, at 336.

This Court need not determine whether the state court "adjudicated on the merits" the ineffective assistance claim in Ground Ten because, even without subjecting the claim to the AEDPA's deferential standard, it is meritless.

When assessing attorney performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Other than his self-serving and unsubstantiated criticisms about trial counsel, there is no evidence in the record suggesting that Williams ever informed trial counsel about Miller's existence. Under the Sixth Amendment, "an attorney has an obligation to provide competent representation—not to be clairvoyant." *Adams v. United States*, No. 06 CR. 218 JSR, 2013 WL 781698, at *10 (S.D.N.Y. Mar. 4, 2013), *report and recommendation adopted*, No. 09 CIV. 9275 JSR, 2013 WL 1248583 (S.D.N.Y. Mar. 27, 2013); *see also Paulino v. United States*, No. 95 CR. 116 (PKL), 1998 WL 214877, at *5 (S.D.N.Y. Apr. 28, 1998) ("A defendant is entitled to a competent lawyer, not an omniscient one."). Trial counsel was not professionally unreasonable for failing to investigate an alibi based on a witness he knew nothing about.

As for Shanda, trial counsel could not have possibly known that Williams thought she could support Miller's alibi testimony, especially given that trial

counsel knew nothing about Miller at the time of trial. Moreover, Williams himself stated on the record that he did not want to call Shanda[20] as a defense witness. Dkt. 20-3, at 526.

Finally, Williams cannot show that he was prejudiced by trial counsel's failure to investigate a purported alibi defense. As discussed above, Miller and Shanda's affidavits are unreliable and unconvincing, and there is no possibility of a more favorable verdict had trial counsel called Shanda and Miller to testify at trial. The ineffective assistance claim in Ground Ten is meritless and does not provide a basis for habeas relief.

## III.   MISCELLANEOUS MOTIONS

### A.   Motion for an Evidentiary Hearing (Dkt. 45)

Williams requests an evidentiary hearing on the following claims that he raised in connection with his fifth CPL § 440.10 motion and included in his Amended Petition: (1) he is actually innocent based on newly discovered alibi evidence; (2) the prosecutor unlawfully obtained his cell phone records and compelled him to become a witness against himself in violation of the Fifth Amendment; and (3) trial counsel was ineffective for failing to investigate alibi witnesses and failing to object and develop the record regarding the Fifth Amendment violation in connection with the subpoena for his cell phone records. *See* Dkt. 45 at 1, 4–5.

---

[20] Her name is spelled "Shonda" in the trial transcript. Dkt. 20-3, at 526–27.

"Section 2254(e)(2) provides that, if a prisoner 'has failed to develop the factual basis of a claim in State court proceedings,' a federal court may hold 'an evidentiary hearing on the claim' in only two limited scenarios." *Shinn v. Ramirez*, 596 U.S. 366, 381 (2022). "Either the claim must rely on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by th[e] [Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Id.* (quoting 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii)). Satisfying either these exceptions is necessary but not sufficient; the petitioner "also must show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged." *Id.* (quoting 28 U.S.C. § 2254(e)(2)(B)).

In all but the "extraordinary cases" where the petitioner satisfies the foregoing requirements, the AEDPA "'bars evidentiary hearings in [§ 2254] . . . proceedings.'" *Shinn*, 596 U.S. at 371 (quoting *McQuiggin*, 569 U.S. at 395). And even if the petitioner satisfies this "stringent" standard for "expand[ing] the state-court record," *id.*, "a federal habeas court still is not required to hold a hearing or take any evidence." *Id.* at 381.

The claims as to which Williams seeks an evidentiary hearing do not rely on a new and previously unavailable constitutional rule made retroactively applicable by the Supreme Court. Even assuming, for the sake of argument, that the claims rely on factual predicates that could not have been previously discovered through

77

the exercise of due diligence, Williams has not shown that an evidentiary hearing would lead to the requisite further factfinding.  According to his papers, he already has mustered all of the "new evidence" supporting his claims and presented it to the state courts in support of his fifth CPL § 440.10 motion.

The state courts were not persuaded by any of his arguments or his "new evidence," as reflected in the denial of the fifth CPL § 440.10 motion and the denial of leave to appeal.  This Court concurs with those conclusions, as discussed above. In particular, Williams's new claim of actual innocence does not come close to satisfying the *Schlup* standard for gateway claims of actual innocence, much less the more stringent standard required by a freestanding claim—assuming such a claim could provide a basis for release from custody in a habeas proceeding.  The "new evidence" on which Williams relies would not have changed the outcome of the trial.

Furthermore, as discussed above, all of the claims in the amended petition are not cognizable, meritless, or both.  This is not an "extraordinary" case, and Williams has not satisfied the Supreme Court's strict perquisites for expanding the record, *see Shinn*, 596 U.S. at 381–82.  Therefore, Williams's motion for an evidentiary hearing is denied.

### B.    Motion to Appoint Counsel (Dkt. 47)

Williams recognizes that there is no constitutional right to appointed counsel in habeas corpus proceedings, *see, e.g.*, *Green v. Abrams*, 984 F.2d 41, 47 (2d Cir.

1993), but argues that an evidentiary hearing is warranted and, as a result, counsel must be appointed to represent him. *See* Dkt. 47, at 4–6.

Rule 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 8(c)") provides that, "[i]f an evidentiary hearing is required [in a § 2254 case], the judge *shall* appoint counsel for a[n indigent] petitioner." *Graham v. Portuondo*, 506 F.3d 105, 107 (2d Cir. 2007) (per curiam) (alterations in original) (emphasis supplied). As discussed above, Williams has not fulfilled the stringent standard for obtaining an evidentiary hearing. Rule 8(c) therefore does not require the Court to appoint counsel for him.

Apart from Rule 8(c), the Criminal Justice Act ("CJA") authorizes federal courts to appoint counsel to any person "seeking relief" under 28 U.S.C. § 2254 who is "financially unable to obtain adequate representation . . . [w]henever . . . the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). The "same standards" set forth in *Hodge v. Police Officers*, 802 F.2d 58 (2d Cir. 1986), for appointing counsel under 28 U.S.C. § 1915(d) "apply in determining whether, in the interest of justice, to appoint counsel for a petitioner in a habeas proceeding." *Cruz v. Smith*, No. 05 CIV.10703 LTS DF, 2007 WL 80865, at *2 (S.D.N.Y. Jan. 10, 2007) (collecting cases).

*Hodge* instructs that, "[a]s a threshold matter . . . the district court must consider the merits of the indigent's claim." 802 F.2d at 60. Even nonfrivolous claims do not necessarily warrant appointment of counsel. *See id.* ("If mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert

summary judgment, required appointment of an attorney under [28 U.S.C.] § 1915(d), the demand for such representation could be overwhelming.").

The Court has considered all of Williams's claims and concludes that none of them warrants habeas relief. Accordingly, the Court denies the motion to appoint counsel.

### C.    Motion for Leave to File Excess Pages (Dkt. 54)

Williams filed a motion seeking leave to file an oversized reply brief in connection with his motion for an evidentiary hearing. Dkt. 54, at 1. Williams asserts he needs to file a seventy-three-page brief "[d]ue to the volume of the amended state court record." *Id.*

Because Williams is unrepresented, his submissions are accorded "great flexibility." *Montes v. Scully*, No. 90 Civ. 1078, 1993 WL 372266, at *3 (E.D.N.Y. Sept. 1, 1993) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1971) (stating that courts "hold [*pro se* pleadings] to less stringent standards than formal pleadings drafted by lawyers pleading")). The state court record in support of the fifth CPL § 440.10 motion is quite lengthy, as Williams indicates. Notably, Respondent has not opposed the request for permission to file an oversized reply brief. Finally, rejecting Williams's oversized brief and requiring him to submit a more concise one would only serve to delay the resolution of his underlying motion, while providing little or no additional benefit." *Swerbilov v. United States*, No. 04-CV-3320 DRH MLO, 2005 WL 1177938, at *1 (E.D.N.Y. May 18, 2005). For all of these reasons, Williams's

motion for leave to file excess pages, Dkt. 54, is granted, and the Court accepts the supplemental reply memorandum of law, Dkt. 55.

### D.      Motion to Strike Respondent's Memorandum of Law (Dkt. 61)

Williams has moved to strike Respondent's memorandum of law in opposition to the amended petition, Dkt. 58, on the basis that Respondent did not comply with the Court's briefing schedule. Dkt. 61. The assigned Assistant Attorney General ("AAG") explained that, although she served the responsive papers to the amended petition "on time, [she] forgot to electronically file [them] on the service date." Dkt. 63, at 1. When she realized her oversight several weeks later, she electronically filed the documents she previously had served by mail on Williams, along with a declaration of service. *Id.* (referring to Dkt. 58 through Dkt. 58-3)).

As the AAG notes, Dkt. 63, at 1–2), Williams responded to Respondent's arguments in opposition to the amended petition by filing his supplemental reply memorandum of law on February 9, 2023. Dkt. 55, at 74. This corroborates the AAG's declaration of service, Dkt. 58-3, stating that she served the memorandum of law and supplemental state court records on Williams by mail on February 1, 2023, *id.* at 1. In addition, a few days after he filed his supplemental reply, Williams filed a pleading complaining about alleged "gaps" in the contents of the supplemental state court records filed by Respondent. *See* Dkt. 56, at 1–2. This also belies his claim that he did not receive Respondent's answering papers in a timely fashion or that Respondent failed to comply with the Court's deadlines.

As Williams is not an electronic filer, he has not shown that he suffered any prejudice as a result of Respondent's belated electronic filing of the answering papers.  There is no basis for the sanction he has requested, and the motion to strike is denied.

### E.   Motion to Disqualify the Attorney General's Office (Dkt. 64)

Williams also has moved, pursuant to Western District of New York Local Rule of Civil Procedure ("L.R. Civ. P.") 7(a)(1), to disqualify the New York Attorney General's Office ("AG's Office") and the assigned AAG from continuing to represent Respondent in this proceeding.  Dkt. 64.  He broadly claims that the AG's Office and the AAG have unspecified conflicts of interest and have violated his city, state, federal, and constitutional rights.  *Id.*, at 1.

The objective of "the disqualification rule is to 'preserve the integrity of the adversary process.'"  *Evans v. Artek*, 715 F.2d 788, 791 (2d Cir. 1983) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  "Motions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are 'often interposed for tactical reasons' and result in unnecessary delay."  *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y. 1991) (quoting *United States Football League v. National Football League*, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985)).  Due to the potential for abuse, the moving party "bear[s] the heavy burden of *proving facts* required for disqualification."  *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir. 1983) (emphasis supplied).

Williams's disqualification motion is entirely devoid of *facts* suggesting that the AG's Office or the AAG have committed any acts or omissions that have negatively affected "the integrity of the adversary process." *Evans*, 715 F.2d at 791. Williams has not come close to carrying the "heavy burden" imposed on parties seeking disqualification of opposing counsel. The disqualification motion lacks an arguable basis in law or fact and is denied.

## CONCLUSION

For the reasons above, the relief requested in the amended petition for a writ of habeas corpus (Dkt. 39) is DENIED, and the amended petition is DISMISSED; the motion for an evidentiary hearing (Dkt. 45) is DENIED; the motion for appointment of counsel (Dkt. 47) is DENIED; the motion for leave to file excess pages (Dkt. 54) is GRANTED; the motion to strike Respondent's memorandum of law in opposition to the amended petition (Dkt. 61) is DENIED; and the motion to disqualify and remove the New York Attorney General's Office as counsel for Respondent (Dkt. 64) is DENIED. Pursuant to 28 U.S.C. § 2253(c)(1), the Court DENIES a certificate of appealability because Williams has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      October 31, 2023
            Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE